**SEVA RESORTS, INC., a Nevada corporation, and Seva Development Corporation, an Arizona corporation, Plaintiffs,**

v.

**Donald HODEL, Secretary of the Interior, Defendant.**

**No. Civ 87–1099 PHX–CAM.**

United States District Court, D. Arizona.

Dec. 8, 1987.

William P. French, Storey & Ross, P.C., Phoenix, Ariz., Daniel H. Israel, Cogswell & Wehrle, Denver, Colo., for plaintiffs.

Arthur G. Garcia, U.S. Atty., Phoenix, Ariz., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW

MUECKE, District Judge.

This action originated when the plaintiff filed a motion for a preliminary injunction and a complaint. Seva seeks an order com-

pelling the Secretary to sign a concessions and a subconcessions contract. Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, this Court consolidated the motion for a preliminary injunction into a trial on the merits. The request for an injunction raises both questions of law and fact, although most of the facts are undisputed. The facts have been presented through a joint statement of facts filed by the plaintiffs and the defendant, exhibits to the various papers filed, and depositions.

## FINDINGS OF FACT

In 1970, the Secretary, through the National Park Service,[1] the Bureau of Indian Affairs, the Bureau of Reclamation, and the Navajo Nation executed a Memorandum of Agreement wherein the parties recognized the desire and intention of the Navajos to develop land contiguous to Lake Powell, located in the Glen Canyon National Recreation Area. In March 1986, the Bureau of Indian Affairs, the Navajo Nation, and the National Park Service issued a Final Development Concept Plan for the development of Antelope Point. The Antelope Point project is an effort to develop a marina and recreational resort along the southern shoreline of Lake Powell on 950 acres of land. Approximately 713 acres of this land are within the boundaries of the Navajo Indian Reservation and the remaining portion is within the boundaries of the Glen Canyon National Recreation Area.

After the execution of the Development Concept Plan, the National Park Service and the Navajo Nation intended for a subconcessioner to actually develop the project. The National Park Service recognized that the Navajos could not provide the financial resources or managerial expertise necessary for the successful development of Antelope Point. The Navajo Nation therefore requested private developers to submit proposals. The party submitting the proposal accepted by the Navajo Nation would become the subconcessioner and the Navajo Nation would be the concessioner.

Seva was one of six parties that submitted proposals. A selection team undertook an evaluation and review of the six applicants. In July 1986, the Navajos announced that Seva was the preferred bidder because their proposal provided the maximum financial benefit to the Navajos, the strongest financial status, the preferred ownership and rental rate, and the most desirable development schedule. Although Ronald E. Everhart of the National Park Service was an observer during the selection process, the Park Service did not conduct an investigation of Seva independent of that conducted by the selection team. The National Park Service, however, was satisfied that Seva had submitted the best proposal.

From August through September 1986, Seva and the Navajo Nation negotiated a Master Lease and Ownership Agreement designed to implement the Development Concept Plan. The lease and ownership agreement were both executed by Seva and the Navajo Nation on October 1, 1986. The Master Lease and the Ownership Agreement were approved through official resolutions of the appropriate committees of the Navajo Tribal Council. In January of 1987, the Bureau of Indian Affairs approved the Master Lease. The Park Service did not take part in the negotiation or approval of the lease.

The Master Lease provides that Seva is entitled to lease certain portions of land on the Navajo Nation for 55 years, to begin upon approval by the Secretary through the Bureau of Indian Affairs. Seva was required to pay rent upon the beginning of the lease. Seva made timely payments from January through September 1987. Because of the disputes that caused the instant litigation, the Navajo Nation tendered to Seva all of the lease payments made through September, 1987. Seva refused to accept repayment of its rent.

---

**1.** Because the Secretary of the Department of the Interior has delegated to the National Park Service authority to execute concessions con-
tracts, the term "Secretary" and the phrase "National Park Service" are used synonymously for purposes of this decision.

During the fall of 1986, the Navajo Nation and the National Park Service negotiated a concessions contract for the project. During the course of negotiations, Seva provided input into the negotiations. In October, the National Park Service submitted the concessions contract to the Navajo Nation. In November, the Navajos signed the contract and returned it to the Park Service for the mandatory 60–day review by Congress.[2] On April 25, 1987, the 60–day review period ended and no changes were proposed or made to the concessions contract.

In January of 1987, the Navajo Nation also submitted to the Park Service the subconcessions contract between Seva and the Navajo Nation. This contract was negotiated only by representatives of Seva and the Tribe. As required by law, the National Park Service reviewed the subconcessions contract, found its terms acceptable and submitted it to Congress for review. After the expiration of the 60–day period, Congress made no changes to the subconcessions contract.

After the expiration of the period provided for congressional review, the general practice of the Park Service is to sign a concessions contract. In fact, the National Park Service has a manual with a hypothetical timetable in which a concessions contract is signed immediately after the expiration of the 60–day review period. In the instant case, however, the Park Service did not follow this hypothetical timetable.

On April 23, 1987, Al Henderson met with Ronald Everhart of the National Park Service. Al Henderson is the director of the Department of Economic Development for the Navajo Nation and principal representative of Peter MacDonald, Chairman of the Navajo Tribal Council. At this meeting, Al Henderson stated that the Tribe was concerned about its relationship with Seva and that the Tribe wanted to examine its relationship with Seva. Henderson also stated that the Tribe may want the Park Service to hold off execution of the conces-

sions contract. On May 8, 1987, Peter MacDonald sent a letter to the National Park Service formally requesting that the Park Service not sign the concessions and subconcessions contract for the Antelope Point project and that the Park Service sign a concessions and subconcessions contract for the Paiute Farms Marina. The contracts relating to the Antelope Point project were not signed, but the Park Service signed the contracts relating to the Paiute Farms Marina.

On June 11, 1987, The National Park Service sent a letter to Peter MacDonald requesting that by September 1, 1987 the Tribe inform the Park Service of their "intention regarding the contract and your ability to carry it out through a subconcessioner or otherwise." On September 1, the Park Service would then decide "whether to execute the existing contract, to withdraw it from further consideration, or take other appropriate action." On June 11, 1987, the Park Service also wrote a letter to Seva informing them that it was honoring Peter MacDonald's request to not execute the concessions contract. The Park Service wrote the letter to Seva in response to a letter requesting that the Park Service execute the contracts.

On August 25, 1987, representatives of the Navajo Nation and the National Park Service met to discuss the future of the Antelope Point project. During this meeting, the representatives of the Park Service were given copies of a letter from Peter MacDonald to the Park Service that outlines his concerns with having Seva act as subconcessioner. The letter, after reciting various negotiations that had taken place between the Tribe and Seva, set forth the following four issues of concern to the Tribe: (1) whether Seva has the capability of completing the project; (2) the fairness of giving "the Tribe no consideration for the value of the Park Service's exclusive concession and the value of the land upon which the project was to be constructed;" (3) whether the project was undercapital-

---

**2.** Congressional review of proposed concessions contracts is an oversight responsibility. After submission of a proposed contract, Congress is given an opportunity to review the contract and make any comments to the contracting official. *See* 16 U.S.C. § 1a–7(c) (1982).

ized and whether the Tribe would have to provide more than the anticipated $3.5 million for infrastructure; and (4) whether it would be better to continue the project with an organization with a "known 'track record.' " The letter further states that at the last meeting between the Tribe and Seva, these concerns were not resolved to the satisfaction of the Tribe.

On September 3, 1987, L. Lorraine Mintzmeyer, Regional Director of the National Park Service, refused to sign the concessions and subconcessions contracts for the Antelope Point project.[3] The reasons for this decision were set forth in the September 3, 1987 letter from the Regional Director to Chairman MacDonald. The letter states that the decision of the Park Service is in "the best interest of the Government." The Park Service stated that it reached this conclusion because the Tribe had lost confidence in Seva's ability to operate as subconcessioner and a subconcessioner was crucial to the Tribe's ability to finance and manage the project. According to the Park Service, it could not depend on the Tribe's performance.

In reaching its decision, the Park Service based its decision upon its belief that visitors to Antelope Point would not be well served. In her deposition, Lorraine Mintzmeyer gave several reasons why she did not feel the public would be well served. First, she cited the reasons set forth in the September 3 letter. Second, she referred to the August 25 letter from Peter MacDonald and the statements made at the August 25 meeting regarding the background of the letter. Finally, Lorraine Mintzmeyer relied upon her prior experiences with concessioners and subconcessioners. According to her, in situations in which there is a dispute between the concessioner and subconcessioner, one can assume that the situation would not be quickly rectified and that services to the visiting public would suffer. Moreover, there would be a strong likelihood that the Navajo Nation, as supervising entity of the sub-

concessions contract, would not enforce the contract or would not adhere to the contract in keeping with the standards of the National Park Service. In reaching its decision, the Park Service did not investigate whether Seva was able to fully perform the contract.

## CONCLUSIONS OF LAW

### A. *Standing*

■ Throughout this litigation the Secretary has maintained that Seva lacks standing because its interest is not within the zone of interest protected by the Concessions Policy Act (hereinafter CPA), 16 U.S.C. §§ 20–20g (1982). The Secretary's argument is based upon the fact that the CPA mentions "concessioners" and not "subconcessioners." This Court rejects the Secretary's argument.

Administrative actions under the CPA can be challenged by a party with standing. *See Glacier Park Found. v. Watt*, 663 F.2d 882, 885 (9th Cir.1981). In order to have standing, a plaintiff must prove an injury in fact and prove that its interest is within the zone of interest to be protected by the statute in question. *See id.* There is no question but that Seva has been injured due to its loss of potential revenues from its subconcessions contract. The only issue is whether the interests of Seva were meant to be protected by the CPA.

The first section of the CPA, 16 U.S.C. § 20 (1982), states that the CPA is being enacted in furtherance of §§ 1 and 2–4 of title 16. In § 3 of title 16, Congress specifically provides for assignments of a contract upon written approval of the Secretary of the Interior. *See also* 36 C.F.R. § 51.7(e) (1987). Thus, it must be concluded that Congress also included the assignees of contracts within the interests protected by the CPA. Any other decision could result in a situation in which a subconcessioner is awarded a contract, is subsequently injured by the Secretary's illegal

---

**3.** A document entitled "Delegation of Authority" delegates authority from the National Park Service to the Regional Director to make decisions regarding concessions contracts. The September 3 letter was actually signed by Homer Rouse, acting on behalf of Lorraine Mintzmeyer.

act under the CPA, but nevertheless lacks standing to protect the very rights that may be delegated to them under the CPA. Therefore, this Court concludes that Seva has standing as a possible assignee of a concessions contract to challenge the actions of the Secretary.

### B. *Violation of the Secretary's Internal Policy Manual*

Seva argues that the Secretary should be forced to sign the concessions and subconcessions contracts because the Secretary's failure to sign them violated his own internal policy manual. The Secretary must follow his own internal procedures even if they are "more rigorous than otherwise would be required." *See Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). Seva argues that a portion of a document known as NPS–48 contains the relevant internal policy.

In the NPS–48 is a hypothetical timetable in which a concession contract is signed immediately after the expiration of the 60–day review period. This document does not set the policy of the National Park Service in stone. The NPS–48 cited by Seva, and attached as exhibit 2 to their motion for preliminary injunction, clearly states that the timetable is hypothetical. Therefore, this Court holds that the Secretary did not violate his own internal policy manual.

### C. *Abuse of Discretion*

Seva's final argument is that the Secretary abused his discretion in deciding not to sign the concessions and subconcessions contracts. The CPA does not provide a standard of review for the decisions of the Secretary. Therefore, this Court must apply the arbitrary and capricious standard of review as set forth in the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq. *See United States v. Garner,* 767 F.2d 104, 115–16 (5th Cir.1985) (arbitrary and capricious standard is applicable because the Housing Act of 1949 does not provide a standard of review).

"[T]he central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision...." *See Garner,* 767 F.2d at 116; *see also International Bhd. of Teamsters v. United States,* 735 F.2d 1525, 1531 (D.C.Cir.1984). In evaluating the Secretary's decision, this Court must make the following three inquiries: (1) did the Secretary act within the scope of his authority and was his decision reasonably based on the facts contained in the administrative record; (2) did the Secretary fail to consider all relevant factors or make a clear error of judgment; and (3) did the Secretary comply with the applicable procedural requirements. *See Arizona Past & Future Found. v. Lewis,* 722 F.2d 1423, 1425 (9th Cir.1983). Because Seva does not challenge the Secretary's decision on the ground of procedural error, this Court need only decide whether the Secretary acted within the scope of his authority and whether the Secretary considered all relevant factors.

### 1. *Scope of Agency Authority*

In determining whether the Secretary acted within the scope of his authority, a reviewing court must determine the following three things: (1) the scope of the Secretary's authority and discretion; (2) whether the Secretary properly construed his authority; and (3) was the Secretary's decision was reasonably based on the facts in the record. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

The Secretary has the authority to publish rules for the management of national parks, 16 U.S.C. § 3 (1982), and to enable concessioners to operate facilities and services for the accommodation of visitors in the national parks. *Id.* at § 20a. Pursuant to these statutory grants of power, the Secretary promulgated the rule set forth in 36 C.F.R. § 51.4(d). *See* 36 C.F.R. § 51.1 (1987). Under § 51.4(d), the Secretary has discretion to terminate the negotiation of concessions contracts before execution if it is in the best interest of the Government to do so. While this Court must give deference to the Secretary's interpretation of his own regulation, that interpretation must nevertheless be examined by this Court to

determine whether the words are reasonably susceptible to the construction placed upon them by the Secretary. *See Villa View Comm. Hosp. v. Heckler,* 720 F.2d 1086, 1090 (9th Cir.1983).

The main problem in this case is the failure of the Secretary to sign the concession and subconcessions contracts after the expiration of the 60–day review period. Seva argues that after a concessions contract is submitted to Congress the Secretary must sign it. The Secretary argues that even after a contract has been submitted to Congress he may still decide not to sign the contract and cease negotiations. In essence, both parties want the Court to look at just one sentence in § 51.4(d) and rule in their favor.[4]

Regulations, however, must be read in their entirety. A sentence in a regulation, standing alone, may not make sense when taken out of context and compared with another sentence also taken out of context. If the two sentences are interpreted and read together, however, some order may be gleaned from what appears at first glance to be an inconsistency. That is the case here.

■ Under the regulations applicable to concession contracts, the Director of the National Park Service "may, in his discretion, terminate negotiation of a Concession Contract ... at any time prior to execution by the Government...." 36 C.F.R. § 51.4(d) (1987). The term "execution" is not defined anywhere in the applicable regulations. Thus, in the absence of a definition within the regulations, execution should be given its normal legal meaning. *See Glacier Park Foundation,* 663 F.2d at 886 (because 36 C.F.R. § 51.4 does not define the term "rejection," it is to be given its normal meaning).

The common law meaning of "execute" is to perform all the necessary formalities required to give validity to a document, including signing. *See e.g., Riegel v. Holmes,* 14 O.O.2d 299, 171 N.E.2d 553, 563 (Oh.Comm.Pl.1960); *see generally Ballantine's Law Dictionary* 432 (3d ed. 1969) (definition of execute); *Black's Law Dictionary* 509 (5th ed. 1979) (same). In the instant case, the Secretary has not signed the contract. This Court therefore holds that the concessions and subconcessions contracts were not executed. Thus, pursuant to § 51.4(d), the Secretary was allowed to terminate negotiations if it was in the best interest of the Government to do so. 36 C.F.R. § 51.4(d) (1987).

■ Seva attempts to counter this conclusion with a two-step argument. First, Seva argues that once a contract is submitted to Congress the parties have finished negotiating ("negotiation of a Concession Contract is completed when such contracts are forwarded to the applicable congressional committees"). The second step in Seva's argument is that after the contract comes back from Congress the Secretary cannot cease negotiations because those negotiations were completed before the contracts were submitted for congressional review. This Court rejects Seva's argument.

The term "negotiation" is also not defined in the regulations. Therefore, it too must be given its normal legal meaning. *See Glacier Park,* 663 F.2d at 886. Although "negotiate" may mean different things in differenct legal contexts, in reference to contracts, "negotiate" means " 'the deliberation which takes place between the parties touching a proposed agreement; the deliberation, discussion or conference on the terms of a proposed agreement....' " *See International Plastics Dev., Inc. v. Monsanto Co.,* 433 S.W.2d 291, 296 (Mo.1968) (quoting 66 C.J.S. *Negotiation* (1950)); *see also Al Herd, Inc. v. Isaac,* 271 Cal.App.2d 749, 76 Cal.Rptr. 697,

---

**4.** Here, the parties are arguing over the following language in § 51.4(d): "After negotiation of Concession Contraracts with an anticipated gross receipts in excess of $100,000 or five (5) years or more in duration, such contracts shall be forwarded to the Senate Committee on Energy and Natural Resources and the House Committee on Interior and Insular Affairs for a 60–day waiting period prior to award. The Director may, in his discretion, terminate negotiation of a Concession Contract or Permit at any time prior to execution by the Government and resolicit or cancel the solicitation when in the best interest of the Government."

699–700 (1969) ("negotiation" means meeting with another so as to arrive through discussion at some kind of agreement).

By replacing the word "negotiation" with its definition in § 51.4(d), the following language appears: "After [discussions as to the terms] of Concession Contracts ..., such contracts shall be forwarded ... for a 60–day waiting period prior to award." The next sentence in § 51.4(d) then allows the Secretary to break off discussions at any time prior to the signing of the concessions contract. 36 C.F.R. § 51.4(d) (1987). By using the common definitions of "negotiate" and "execute," one gets a picture of a regulation that allows the Secretary to do that which many parties entering into contracts can do: after two parties have agreed upon the proposed terms of a contract, a party may terminate their participation at any time prior to the signing of that contract. An interpretation of § 51.4(d) that allows the Secretary to do that which other parties can do when entering into contracts makes sense. This Court therefore holds that after the submission of a concessions or subconcessions contract to Congress, the Secretary still has discretion to terminate negotiations and refuse to sign the contract. Thus, it follows that in this case the Secretary correctly construed the scope of his authority.

### 2. *Consideration of All Relevant Factors or Clear Error in Judgment*

The next step in our analysis is to determine whether the decision to not sign the concessions and subconcessions contracts was based on a consideration of the relevant factors and whether there has been a clear error in judgment. *See Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823–24. Although judicial review of agency action is narrow, the court must be satisfied that the Secretary examined the relevant data and articulated a satisfactory explanation for his action, including a rational connection between the facts found and the choice made. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Sears Sav. Bank v. Federal Sav. and Loan Ins. Corp.*, 775 F.2d 1028, 1029 (9th Cir.1985). A court, however, cannot supply a reasoned basis for the Secretary's action that the Secretary has himself not given. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Sears Sav. Bank*, 775 F.2d at 1029. The administrative record must provide a clue as to the analysis employed by the Secretary. *See Sears Sav. Bank*, 775 F.2d at 1029. A court, however, can uphold a decision of less than ideal clarity if the Secretary's reasoning can be plausibly discerned. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), *reh'g denied*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Sears Sav. Bank*, 775 F.2d at 1029.

To decide whether the Secretary's decision was arbitrary or capricious here, this Court must determine whether the Secretary considered the factors relevant to selecting a concessioner that would best satisfy the purposes of the CPA. *See American Paper Inst. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 413, 103 S.Ct. 1921, 1928, 76 L.Ed.2d 22 (1983) (to decide whether the Federal Energy Regulatory Commission acted arbitrarily or abused its discretion, we must determine whether the agency adequately considered the factors relevant to choosing a rate that will best serve the purposes of the Public Utility Regulatory Policies Act of 1978). We must therefore turn to the criteria set forth in the CPA for the selection of concessioners.

The CPA gives the Secretary discretion in choosing concessioners. *See Canyoneers, Inc. v. Clark*, 596 F.Supp. 106, 110 (D.Ariz.1984), *aff'd on other grounds sub nom., Canyoneers, Inc. v. Hodel*, 756 F.2d 754 (9th Cir.1985), *cert. denied*, 474 U.S. 846, 106 S.Ct. 138, 88 L.Ed.2d 114 (1985). Under the CPA, the Secretary "shall take such action as may be appropriate to encourage and enable ... corporations ... to provide and operate facilities and services which he deems desirable for the accommodation of visitors...." 16 U.S.C. § 20a (1982). Thus, the Secretary was to have considered two

factors: (1) the importance of encouraging private concessioners to provide and operate facilities, *see* S.Rep. No. 765, 89th Cong., 1st Sess. 5, *reprinted in* 1965 U.S. Code Cong. & Ad.News, 3489, 3493 (1965) (CPA directs the Secretary to "encourage and enable" persons to provide and operate facilities); and (2) the accommodation of the visitors to Antelope Point. *See Canyoneers*, 596 F.Supp. at 110; *see also* Deposition of L. Lorraine Mintzmeyer at 20 (the phrase "best interest of the Government" in 36 C.F.R. § 51.4(d) means "service and benefit to the visitor"); Joint Statement of Facts #18 ("The primary function of the National Parks Service in the supervision of concessions is to ensure that quality service is being provided to the public visitor.").

■ The Secretary did consider the importance of encouraging private concessioners. In the last paragraph of the September 3, 1987 letter, the National Park Service stated that it was going to "review the terms and conditions of the proposed contract." According to Lorraine Mintzmeyer, the purpose of this sentence was to make certain that the Park Service has a firm contract that can be achieved. *See* Deposition of L. Lorraine Mintzmeyer at 120–21. In addition, the letter states that the Navajo Nation will have to agree to the selection of a subconcessioner in accordance with the National Park Service Selection procedures for developers and managers. The purpose of this sentence was "to insure that we … receive good, valid, and substantive offers from potential developers for the subconcession." *See id.* The Park Service believes that if its procedures are used, private bidders will not be deterred from bidding on the project in the future. *See id.* at 122. In part, Lorraine Mintzmeyer reached this conclusion because of the good reputation the Park Service has with developers and managers. *See id.* These facts show that the Secretary considered the importance of encouraging private concessioners. These facts also show a rational relationship to the conclusion that private concessions would not be deterred.

The Secretary also considered whether the visitors to Antelope Point would be accommodated if the concessions contract was signed. The September 3, 1987 letter from the National Park Service to the Navajo Nation clearly states that the Park Service did not believe that it could depend on the Navajo's performance. Lorraine Mintzmeyer, as Regional Director of the Park Service, gave several reasons why the Park Service did not sign the concessions contract. First, there was the reason cited in the September 3 letter; the Park Service could not depend on the performance of the Tribe. Deposition of L. Lorraine Mintzmeyer at 105, 107. Second, there was the letter from Peter MacDonald to the National Park Service in which the Tribe lists four areas of concern that it has in going forward with the project with Seva as subconcessioner. *See id.* at 112–13. In that letter, the Tribe states that it was concerned about Seva's possible incapability in completing the project, the possible undercapitalization of Seva that may require the outlay of $3.5 million from the Tribe, and whether it would be better if the project went forward with an organization with a "known 'track record.'" In addition, there was the discussion that took place at the meeting between the Park Service and representatives of the Navajo Nation. *See id.*

Furthermore, Lorraine Mintzmeyer relied upon her past experiences with concessioners and subconcessioners. In her deposition, Lorraine Mintzmeyer stated that in situations in which there is a dispute between a concessioner and a subconcessioner, one can assume that services to the public would suffer. *Id.* at 113. According to her, "If there is a basic major disagreement, which it appears there are between the two parties, then it is not up to me to make the assumption that in fact they are resolvable in one or two days…." *Id.* Throughout period in which the Park Service was making its decision, it was primarily concerned with its relationship with the Navajo Nation as prime concessioner. According to Lorraine Mintzmeyer, it does not make sense to drag a party into a concessions and subconcessions agreement, when "there was a strong likelihood

that since they would have to be the individual entity who would be the supervising entity of the subconcession that they would not enforce the contract or achieve their role as being the prime concessioner to ... [the] standards" of the National Park Service. *Id.* at 23–24.

Given the foregoing evidence, this Court holds that the Secretary examined the relevant evidence and provided a reasonable explanation for not signing the concessions contract. In determining whether to sign a concessions contract, the Secretary is forced to look into the future and determine the possibility of a concessioner adequately serving the public. When a concessioner tells the Secretary that they no longer wish to be a concessioner, it seems foolish to force them to be a party. To the Court, it seems reasonable to conclude that public service would suffer if the Tribe were forced to work with Seva.

Seva argues, however, that the Secretary's decision is not rationally related to the facts because the visitors to Antelope Point would be adequately served. Seva asserts that the visitors will be adequately served because the subconcession contract expressly delegates to Seva all rights, duties and obligations of the Navajo Nation under the concession contract. According to Seva, execution of the concessions contract and subconcessions contract would result in the Navajos having no duties and that the Secretary could therefore enforce the terms of the concessions contract directly against Seva.

If this Court were allowed to second guess the decision of the Secretary and determine whether the concessions and subconcessions contracts should be executed, we may reach a different result. However, the role of a federal court is not to examine the rationality of the decision made, *but to examine the rationality of the agency's decisionmaking process. See Garner,* 767 F.2d at 116; *International Bhd. of Teamsters,* 735 F.2d at 1531. Here, the decisionmaking process of the National Park Service operated as Congress intended it to. The Regional Director evaluated a situation in which a con-

cessioner did not wish to go through with an unexecuted contract and a subconcessioner did. Unfortunately for Seva, the Regional Director determined that the public would probably suffer if the Navajo Nation were forced into the contract.

While the Court understands that almost all of the performance of the agreements was to be done by Seva, it also knows that the Navajo Nation is primarily liable for performance of the contract. A party that is unwilling to do something may not do an adequate job when forced into a contractual situation. This Court cannot force the Secretary to take the risk that that a project may or may not be completed.

■ Seva also argues that in not inquiring into whether Seva could perform the subconcessions contract, the Secretary failed to consider important factors. The factors that are to be considered by an agency are those that satisfy the purposes of the statute. *See American Paper Inst.,* 461 U.S. at 413, 103 S.Ct. at 1928. Here, the factors for consideration are encouraging private concessioners to operate facilities and the accommodation of visitors. The Secretary considered both factors. A subfactor in determining whether the visitors of Antelope Point would be served well is whether Seva could in fact perform the contract. However, this Court has found no case from the Supreme Court, the circuit courts, or other district courts that requires a reviewing court to not only determine whether an agency considered the relevant factors under the statute, but also evaluate the factors that were used by the agency to evaluate the statutory factors. To require federal courts evaluate the factors used to evaluate factors would be almost like *de novo* review of an administrative decision. This we refuse to do. Therefore, this Court holds that the Secretary was not required to determine whether Seva could perform the terms of the concessions contract.

### CONCLUSION

For the foregoing reasons, this Court denies Plaintiffs' motion for an injunction. IT IS ORDERED that the defendant shall

submit a form of judgment in accord with the above findings of fact and conclusions of law no later than December 22, 1987, preferably having the form of judgment approved by the attorney for the Plaintiffs.