**SEVA RESORTS, INC., a Nevada corporation; Seva Development Corporation, an Arizona corporation, Plaintiffs–Appellants,**

v.

**Donald P. HODEL, Secretary of the Interior, Defendant–Appellee.**

No. 88–1724.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 7, 1989.

Decided June 2, 1989.

As Amended July 12, 1989.

Daniel H. Israel, Daniel H. Israel, P.C., Denver, Colo., for plaintiffs-appellants.

Arthur G. Garcia, Asst. U.S. Atty., Phoenix, Ariz., for defendant-appellee.

Before GOODWIN, Chief Judge, ALARCON and NELSON, Circuit Judges.

ALARCON, Circuit Judge:

Seva Resorts, Inc., a Nevada corporation, and Seva Development Corporation, an Arizona corporation, (Seva) appeal from the judgment of the district court dismissing the action and denying Seva's motion for an injunction against Donald Hodel, Secretary of the Interior (Secretary). Seva sought an order from the district court that would compel the Secretary to sign and execute a concession contract concerning both federal lands and Indian trust lands entered into between the National Park Service (NPS) and the Navajo Nation under authority granted to him under the Concessions Policy Act of 1965, 16 U.S.C. § 20, *et seq.* (1982 & Supp. IV 1986). Seva also sought to compel the Secretary to approve a subconcession contract between Seva and the Navajo Nation concerning only Indian trust lands under the authority granted to him under 25 U.S.C. § 415 (Supp. IV 1986) regarding lease agreements involving Indian trust lands. These agreements were the result of negotiations between the Navajo Nation, Seva, and the NPS to develop a marina resort complex on adjacent Indian and federal land located at Antelope Point in the Glen Canyon National Recreation Area.

We affirm because we have concluded that the Secretary did not abuse his discretion in refusing to sign the contracts.

I

The parties do not contest the facts in this case. Seva and the Secretary filed a joint statement of facts with the district court.

The Secretary of the Interior heads the Bureau of Indian of Affairs (BIA) and the NPS. In 1970 the Secretary executed a memorandum of agreement in which NPS, the BIA, the Bureau of Reclamation (BOR), and the Navajo Nation recognized that the Navajo Nation desired to develop land contiguous to Lake Powell, in the Glen Canyon National Recreation Area. In March of 1986 the BIA, the Navajo Nation, and the NPS issued a final plan for the development of a marina and recreational resort along the southern shoreline of Lake Powell on 950 acres of land. Approximately 713 acres of that land are in the Navajo Indian Reservation and the remainder lies in the Glen Canyon National Recreation Area. Under the development plan, the Navajo Nation is the concessioner.

Subsequently, the NPS and the Navajo Nation decided to select a subconcessioner because the Navajo Nation did not have the financial resources or managerial expertise to develop Antelope Point successfully. Accordingly, the Navajo Nation solicited proposals from private persons desirous of being selected as subconcessioner.

A selection team evaluated and reviewed the proposals submitted by six parties including Seva. The Navajo Nation announced in July of 1986 that Seva was the preferred bidder for the subconcession contract because its proposal provided the greatest financial benefit, the strongest financial status, a favorable ownership and rental rate, and the most desirable development schedule. The NPS did not conduct an independent investigation of Seva. Ronald E. Everhart of the NPS was an observer during the process of selecting the subconcessioner. The NPS was satisfied that Seva submitted the best proposal.

On October 1, 1986, after Seva had been selected the subconcessioner, Seva and the Navajo Nation executed a master lease and ownership agreement (lease). Appropriate committees of the Navajo Tribal Council approved the lease by official resolutions. The Secretary, acting through the BIA, approved the lease in January of 1987. The term of the 55–year lease commenced on the date the Secretary approved it. The NPS did not participate in the negotiations regarding the lease of tribal lands.

The Navajo Nation and the NPS negotiated a concession contract for the project in the fall of 1986. Seva provided input into

the negotiations. The NPS submitted the concession contract to the Navajo Nation in October 1986. The Navajo Nation signed and returned the concession contract in November, for the mandatory 60–day review by Congress. On April 25, 1987, the 60–day review period ended. Congress did not propose any changes in the concession contract.

In January of 1987, the Navajo Nation submitted the subconcession contract to the NPS. The subconcession contract was negotiated by representatives of Seva and the Navajo Nation without participation by the NPS. The NPS reviewed the subconcession contract, accepted the terms, and submitted it to Congress for review. Congress made no changes to the subconcession contract within the 60–day period.

Al Henderson, the Director of the Department of Economic Development for the Navajo Nation and principal representative of Peter MacDonald, Chairman of the Navajo Tribal Council, met with Ronald Everhart of the NPS on April 23, 1987. Henderson stated at this meeting that the Navajo Nation was concerned with its relationship with Seva and wanted to reexamine it. Henderson informed Everhart that the Navajo Nation might want the NPS to postpone execution of the concession contract.

Seva made timely payments to the Navajo Nation as required by the lease agreement from January 1987 through September of that year. During this period a dispute arose between the Navajo Nation and Seva concerning whether the Secretary should approve the concession contract as a result of questions raised by the Navajo Nation as to Seva's capability to perform its duties as a subconcessioner. As a result of this dispute, the Navajo Nation tendered to Seva all of the lease payments made through September 1987. Seva refused to accept the repayment of its rent.

On May 8, 1987, MacDonald sent a letter to the NPS requesting that the Secretary refrain from signing the concession and subconcession contracts for the Antelope Point project. On June 11, 1987, the NPS sent a letter to MacDonald requesting information regarding the ability of the *Navajo Nation* to perform its obligations under the *concession* contract. The NPS indicated that it would decide on September 1 whether to execute the concession contract, to withdraw it from further consideration, or to take other appropriate action. On June 11, the NPS informed Seva that the Secretary, through his delegate the Regional Director of the National Park Service, would honor MacDonald's request not to execute the concession contract.

On August 25, 1987, representatives of the NPS and the Navajo Nation met to discuss the future of the Antelope Point project. At this meeting, NPS received copies of a letter from MacDonald to the NPS outlining his concerns about Seva. In that letter MacDonald indicated that he had been unable to resolve disputes that had arisen in the negotiations with Seva. MacDonald related the following concerns: (1) whether Seva had the capability of completing the $30 million project; (2) whether the Navajo Nation would be forced to invest additional funds because the project was undercapitalized; (3) whether it was fair that Seva gave the Navajo Nation no consideration for the value of the exclusive concessions and the value of the land upon which the project was to be constructed and; (4) whether it would be wiser to continue the project with an organization with a known track record. The letter also stated that these concerns were not resolved to the satisfaction of the Navajo Nation at its last meeting with Seva. The NPS advised MacDonald in a letter dated September 3, 1987, that the Secretary would decline to sign the concession and subconcession contracts for the Antelope Point project.

Seva filed a complaint on July 9, 1987, for declaratory, mandamus, and injunctive relief. On December 24, 1987, after a trial on the merits, the district court filed a judgment dismissing the action. *Seva Resorts, Inc. v. Hodel*, 675 F.Supp. 1542 (D.Ariz.1987). This appeal followed.

We review agency action independently, without deference to the district court's rulings. *Arizona Past & Future Found., Inc. v. Lewis*, 722 F.2d 1423, 1425–26 (9th Cir.1983). We must set aside agency ac-

tion if the Secretary's decision was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' " or if the agency action violates statutory, procedural, or constitutional requirements. *Id.* at 1425 (quoting 5 U.S.C. § 706(2)(A), (B), (C), (D) (1982)); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

## II

■ Seva contends that the Secretary had no authority to decline to sign the concession and subconcession contracts because Congress did not intend to grant the Secretary *two* independent opportunities to bargain and consummate recreation development contracts simply because both trust lands and federal lands were involved. Seva argues that "repudiation of the 55-year Master Lease ignores the Secretary's own regulations—25 C.F.R. § 162.14—which provides Seva a due process hearing, an opportunity to correct any alleged contract performance deficiencies, and an appeal to the BIA." Seva's arguments confuse the Secretary's authority to approve leases of Indian land under 25 U.S.C. § 415, with his authority to execute concession contracts under 16 U.S.C. § 20 *et seq.* and 36 C.F.R. §§ 51.1 and 51.4(d) (1988).

Indian lands may not be leased unless the Secretary approves. 25 U.S.C. § 415. The evidence does not support Seva's argument that the Secretary repudiated the master lease. Instead, the record shows that the Secretary declined to sign the concession contract. 25 C.F.R. § 162.14 (1988) provides in pertinent part:

> Upon a showing satisfactory to the Secretary that there has been a violation of the lease or the regulations in this part, the lessee shall be served with written notice setting forth in detail the nature of the alleged violation and allowing him ten days from the date of receipt of notice in which to show cause why the lease should not be cancelled.

The procedural requirements of 25 C.F.R. § 162.14 are inapplicable because that regulation addresses the Secretary's authority to oversee performance of obligations under a lease agreement; it does not limit the Secretary's authority to execute a concession contract.

Seva's request for injunctive relief referred solely to the Secretary's role regarding concession and subconcession contracts. The Secretary's authority to ratify or repudiate a lease agreement involving Indian land is separate from his responsibility to withhold approval of a concessions contract involving federal lands administered by the NPS.

The Secretary's authority to execute concession contracts on federal lands derives from the Concessions Policies Act of 1965, 16 U.S.C. § 20 *et seq.* All concession contracts and permits are subject to the requirements of 36 C.F.R. § 51 *et seq.* Section 51.4(d) provides in pertinent part as follows:

> After negotiation of Concession Contracts ... such contracts shall be forwarded to the Senate Committee on Energy and National Resources and the House Committee on Interior and Insular Affairs for a 60–day waiting period prior to award. The Director may, in his discretion, terminate negotiation of a concession contract or permit at any time prior to execution by the Government and resolicit or cancel the solicitation when in the best interest of the Government.

Seva's reliance on *Yavapai–Prescott Indian Tribe v. Watt,* 707 F.2d 1072 (9th Cir.), *cert. denied,* 464 U.S. 1017, 104 S.Ct. 548, 78 L.Ed.2d 723 (1983) is also misplaced. In *Yavapai–Prescott,* we found that an Indian tribe could not unilaterally terminate a lease without obtaining the Secretary's approval. *Id.* at 1073. The Secretary approved the lease pursuant to 25 U.S.C. § 415, which authorizes "commercial leases of Indian lands, as implemented by 25 C.F.R. §§ 162.1–162.20." *Id.* at 1073 (footnote omitted). 25 C.F.R. § 162.14 "establishes procedures, in the event of a breach of a lease agreement, for the secretary to participate in the cancellation of the lease." *Id.* As noted above,

the matter before this court does not concern the cancellation of a *lease* of Indian land without the Secretary's approval. It is also worthy of note that the concession contract involves federal lands administered by the NPS.

### III

■ Seva claims the Secretary's actions are contrary to 16 U.S.C. § 20 (1982) and that once Congress permitted the 60-day waiting period to expire without expressing disapproval, the Secretary had a duty to sign the concession contract.

Section 20a provides in pertinent part: [T]he Secretary of the Interior shall take such action as may be appropriate to encourage and enable private persons and corporations (hereinafter referred to as "concessioners") to provide and operate facilities and services which he deems desirable for the accommodation of visitors in areas administered by the National Park Service.

The Secretary has the authority to publish rules for the management of national parks pursuant to 16 U.S.C. § 3 (1982), and to enable concessioners to operate facilities and services for the accommodation of visitors in the national parks under 16 U.S.C. § 20a.

The Secretary has interpreted the rules and regulations as permitting him to terminate the negotiation of concession contracts at any time prior to execution if, in his discretion, such action is "in the best interests of the government." 36 C.F.R. § 51.4(d). In this case the Secretary concluded that under section 51.4(d) he had the power to terminate negotiations of the concession contract *after* the mandatory 60-day waiting period but *before* he signed it. We must examine the Secretary's interpretation in light of the language of the regulations. *Villa View Community Hosp., Inc. v. Heckler*, 720 F.2d 1086, 1090 (9th Cir.1983). "The words must be reasonably susceptible to the construction placed upon them by the Secretary, both on their face and in light of their prior interpretation and application." *Id.* (quotation omitted).

Section 51.4(d) does not define the term "execution." In the absence of a definition within the regulations, we must assume execution carries its normal legal meaning. *See Glacier Park Found. v. Watt*, 663 F.2d 882, 886 (9th Cir.1982) (the term "rejection" carries its normal legal meaning in the absence of a definition within the regulations). The legal definition of the term "execute" is: "To perform all necessary formalities, as to make and sign a contract." *Black's Law Dictionary* 509 (5th ed. 1979). "The term 'negotiation' encompasses the period starting at the time the developer first contacts tribal representatives and continuing until the Secretary renders an official decision." *Quantum Exploration, Inc. v. Clark*, 780 F.2d 1457, 1461 (9th Cir.1986).

Because section 51.4(d) permits the Secretary to terminate negotiation of a concession contract before it is signed, the district court correctly determined that the Secretary acted within his statutory authority. *See Quantum Exploration, Inc.*, 780 F.2d at 1461 (a tribe can unilaterally rescind a proposed mineral development agreement prior to official approval by the Secretary).

### IV

■ Seva contends that the Secretary abused his discretion in terminating negotiations without signing the concession contract because he failed to consider congressional policy encouraging private recreation development on Indian trust and federal lands.

We will set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). To make this finding we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416, 91 S.Ct. at 823–24 (citations omitted).

We must determine whether the Secretary considered factors relevant to satisfying the purposes of the Concessions Policy Act in selecting a concessioner. *See Amer-*

*ican Paper Inst. v. American Elec. Power,* 461 U.S. 402, 413, 103 S.Ct. 1921, 1927–28, 76 L.Ed.2d 22 (1983) (the Federal Energy Regulatory Commission must adequately consider the factors relevant to choosing a rate that will best serve the purposes of the Public Utility Regulatory Policies Act of 1978).

The Concessions Policy Act gives the Secretary discretion to select concessioners. 16 U.S.C. § 20a. The policy of the Secretary is to limit concession activities in park areas "to those that are necessary and appropriate for public use and enjoyment of the park areas ... and that are consistent to the highest practicable degree with the preservation and conservation of the park areas." 36 C.F.R. § 51.2 (1988). Additionally, the NPS may terminate negotiations and cancel solicitation of a concession contract when "in the best interests of the Government." 36 C.F.R. § 51.4(d).

In a letter dated September 3, 1987, Homer Rouse, acting on behalf of Lorraine Mintzmeyer, the Regional Director of the NPS, advised MacDonald that "it is in the best interests of the Government to terminate negotiations on the concession contract for Antelope Point in Glen Canyon National Recreation Area." The NPS explained that it could not depend on performance of the terms of the concession contract by the Navajo Nation, as concessioner, in view of the Navajo Nation's loss of confidence in Seva. NPS informed MacDonald that the choice of a subconcessioner is crucial to the ability of the Navajo Nation to finance and manage a resort and marina of the scale under consideration.

Mintzmeyer testified during her deposition that the NPS had concluded that visitors to Antelope Point would not be well served by signing the concession contract in the face of the Navajo Nation's opposition to Seva. In support of her opinion, Mintzmeyer relied upon the factors set forth in the August 25, 1987 letter from MacDonald, as well as her prior experience with concessioners and subconcessioners. Mintzmeyer testified that if a concessioner and subconcessioner are involved in a dispute, services to the public suffer until the

disagreement is resolved. Additionally, the NPS was concerned that a concessioner might not comply or adhere to a concession contract in conformance with NPS standards if forced into working with a subconcessioner no longer acceptable to it.

Seva argues that the Secretary's disapproval of the concession and subconcession contracts violated his duty to encourage economic development on the reservations because it will discourage developers from bidding on future projects. The record does not support this contention. Mintzmeyer testified in her deposition that the Secretary has a "longstanding reputation" with developers and managers, who understand that under NPS procedures "things are done with integrity." The entire Antelope Point development will be "done in the Commerce Business Daily which goes out to 48 states and all developers" in the country. Mintzmeyer indicated that, in her opinion, the NPS has no concern that private business will be deterred from bidding on the Antelope Point project, and that the NPS should receive "very good offers."

After an independent review of the evidence, we are persuaded that the Secretary gave proper consideration to his duty to provide good service to the park visitors. The Secretary properly determined that the public would not be served adequately by forcing the Navajo Nation into an agreement it might not be able to perform with a subconcessioner no longer acceptable to it. Therefore, the Secretary's decision not to execute the concession and subconcession contracts was not arbitrary, capricious, or an abuse of discretion.

## V

Seva contends that the doctrine of equitable estoppel protects Seva's 55–year master lease interests from the Secretary's refusal to execute the concession and subconcession contracts.

To establish equitable estoppel a party must show that:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel

has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Holland Livestock Ranch v. United States*, 655 F.2d 1002, 1007 (9th Cir.1981) (quotation omitted). "Estoppel should be applied against the Government with utmost caution and restraint." *Walker v. Navajo–Hopi Indian Relocation Comm'n*, 728 F.2d 1276, 1280 (9th Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984) (quotation omitted). When estoppel is alleged against the United States, "a showing of 'affirmative misconduct' rather than 'mere neglect' must be made." *Holland Livestock Ranch*, 655 F.2d at 1007 (citation omitted). A party claiming equitable estoppel must prove the existence of an affirmative act of misrepresentation or of concealment on the part of the government. *United States v. Ruby Co.*, 588 F.2d 697, 703–04 (9th Cir.1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). The affirmative act by the government must outweigh "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (quotation omitted).

The record fails to establish that the Secretary engaged in affirmative misconduct or had a legal obligation to sign the concession contract pursuant to 36 C.F.R. § 51.4(d). As discussed above, the Secretary did not act arbitrarily or capriciously, nor did he abuse his discretion in terminating the negotiations regarding the concession contract.

Seva's reliance on the expectation that the concession contract would be signed by the Secretary was not justified in light of the statutes and regulations governing the execution of concession contracts. *See Western Pioneer, Inc. v. United States*, 709 F.2d 1331, 1339 (9th Cir.1983) (plaintiff should have been on notice that it could not reasonably rely on Coast Guard nonenforcement of the manning statutes and plaintiff proceeded at its own risk in purchasing and converting vessels). Seva entered into the lease agreement with the Navajo Nation and began negotiations for a subconcession contract with knowledge that the Secretary had not signed the concession contract. Seva knew that Congress had to approve and that the Secretary had to execute the concession contract pursuant to 16 U.S.C. § 20–20g and 36 C.F.R. § 51.4(d). Seva assumed the risk that the Secretary would not execute a concession contract with the Navajo Nation. Seva has failed to demonstrate that the Secretary should be estopped from refusing to sign the concession contract.

## VI

■ Seva asserts that the Secretary has violated Navajo law by not executing the concession and subconcession contracts based on concerns voiced by certain members of the Tribal council after the council had already formally approved the deal.

To support this proposition, Seva relies on *Lomayaktewa v. Hathaway*, 520 F.2d 1324 (9th Cir.1975), *cert. denied*, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976). Seva's reliance on *Lomayaktewa* is misplaced. *Lomayaktewa* concerns the requirement that all indispensable parties must be joined in an action to set aside a lease of certain Indian lands. *Id.* at 1325.

Seva's argument misses the point that it was the Secretary, and not any particular members of the Tribal council who decided against executing the concession contract. The issue presented to this court is whether the Secretary can be compelled to sign a concession contract where he has considered all the relevant factors in exercising his discretion to terminate negotiations regarding a concession contract. Seva has pointed to no authority limiting the Secretary's sources of information on which to base decisions concerning concession contracts.

Seva also claims that the Navajo Tribal Council exercises the governmental powers of the Navajo Nation and therefore, the Navajo Tribal council had the power to execute the concession and subconcession contracts with Seva. *Kerr–McGee Corp. v. Navajo Tribe*, 471 U.S. 195, 201, 105 S.Ct.

1900, 1904, 85 L.Ed.2d 200 (1985). *Kerr–McGee Corp.* recognized the Navajo Tribal Council's authority to enact ordinances to tax the value of leasehold interests on tribal lands and on receipts from the sale of property or services concerning those lands. *Id.* at 197, 105 S.Ct. at 1902. However, nothing stated in *Kerr–McGee Corp.* accords the Navajo Tribal Council the power to compel the Secretary to execute a concession contract involving *federal* land administered by the NPS.

## CONCLUSION

The record supports the district court's denial of an injunction to compel the Secretary to execute the concession and subconcession contracts. The Secretary did not abuse his discretion in refusing to sign the concession contracts. Our narrow decision in this matter should not be construed as foreclosing an action against the Navajo Nation for alleged improper interference with a business relationship.

AFFIRMED.