## KERR-McGEE CORP. *v.* NAVAJO TRIBE OF INDIANS ET AL.

No. 84–68.   Argued February 25, 1985—Decided April 16, 1985

BURGER, C. J., delivered the opinion of the Court, in which all Members joined, except POWELL, J., who took no part in the consideration or decision of the case.

*Alvin H. Shrago* argued the cause and filed briefs for petitioner.

*Elizabeth Bernstein* argued the cause and filed a brief for respondents.

*Deputy Solicitor General Claiborne* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Assistant Attorney General Habicht,* and *John A. Bryson.**

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the Navajo Tribe of Indians may tax business activities conducted on its land without first obtaining the approval of the Secretary of the Interior.

I

In 1978, the Navajo Tribal Council, the governing body of the Navajo Tribe of Indians, enacted two ordinances impos-

---

*Briefs of *amici curiae* urging reversal were filed for Arizona Public Service Co. et al. by *Robert B. Hoffman;* for Peabody Coal Co. by *Jeffrey B. Smith;* for Phillips Petroleum Co. et al. by *Alan L. Sullivan* and *Clark R. Nielsen;* for the Salt River Project Agricultural Improvement and Power District by *Frederick J. Martone;* and for Texaco, Inc., by *Bruce Douglas Black.*

Briefs of *amici curiae* urging affirmance were filed for the Association on American Indian Affairs, Inc., et al. by *Arthur Lazarus, Jr.,* and *W. Richard West, Jr.;* and for the Shoshone Indian Tribe Reservation, Wyoming, et al. by *Reid Peyton Chambers, Loftus E. Becker, Jr., Thomas W. Fredericks,* and *Peter C. Chestnut.*

*F. Browning Pipestem* filed a brief for the Sac and Fox Tribe of Indians of Oklahoma as *amicus curiae.*

ing taxes known as the Possessory Interest Tax and the Business Activity Tax. The Possessory Interest Tax is measured by the value of leasehold interests in tribal lands; the tax rate is 3% of the value of those interests. The Business Activity Tax is assessed on receipts from the sale of property produced or extracted within the Navajo Nation, and from the sale of services within the nation; a tax rate of 5% is applied after subtracting a standard deduction and specified expenses. The tax laws apply to both Navajo and non-Indian businesses, with dissatisfied taxpayers enjoying the right of appeal to the Navajo Tax Commission and the Navajo Court of Appeals.

The Navajo Tribe, uncertain whether federal approval was required, submitted the two tax laws to the Bureau of Indian Affairs of the Department of the Interior. The Bureau informed the Tribe that no federal statute or regulation required the Department of the Interior to approve or disapprove the taxes.

Before any taxes were collected, petitioner, a substantial mineral lessee on the Navajo Reservation, brought this action seeking to invalidate the taxes. Petitioner claimed in the United States District Court for the District of Arizona that the Navajo taxes were invalid without approval of the Secretary of the Interior. The District Court agreed and permanently enjoined the Tribe from enforcing its tax laws against petitioner.

The United States Court of Appeals for the Ninth Circuit reversed. 731 F. 2d 597 (1984). Relying on *Southland Royalty Co.* v. *Navajo Tribe of Indians*, 715 F. 2d 486 (CA10 1983), it held that no federal statute or principle of law mandated Secretarial approval.[1]

We granted certiorari. 469 U. S. 879 (1984). We affirm.

---

[1] The Ninth Circuit rejected petitioner's other contentions, which included Commerce Clause and contractual challenges to the two taxes. Petitioner has not sought review of this aspect of the Court of Appeals' judgment.

## II

In *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130 (1982), we held that the "power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management." *Id.*, at 137. Congress, of course, may erect "checkpoints that must be cleared before a tribal tax can take effect." *Id.*, at 155. The issue in this case is whether Congress has enacted legislation requiring Secretarial approval of Navajo tax laws.

Petitioner suggests that the Indian Reorganization Act of 1934 (IRA or Act), 48 Stat. 984, 25 U. S. C. § 461 *et seq.*, is such a law. Section 16 of the IRA authorizes any tribe on a reservation to adopt a constitution and bylaws, subject to the approval of the Secretary of the Interior. 25 U. S. C. § 476. The Act, however, does not provide that a tribal constitution must condition the power to tax on Secretarial approval. Indeed, the terms of the IRA do not govern tribes, like the Navajo, which declined to accept its provisions. 25 U. S. C. § 478.

Many tribal constitutions written under the IRA in the 1930's called for Secretarial approval of tax laws affecting non-Indians. See, *e. g.*, Constitution and Bylaws of the Rosebud Sioux Tribe of South Dakota, Art. 4, § 1(h) (1935). But there were exceptions to this practice. For example, the 1937 Constitution and By-laws of the Saginaw Chippewa Indian Tribe of Michigan authorized the Tribal Council, without Secretarial approval, to "create and maintain a tribal council fund by . . . levying taxes or assessments against members or nonmembers." Art. 6, § 1*(g)*. Thus the most that can be said about this period of constitution writing is that the Bureau of Indian Affairs, in assisting the drafting of tribal constitutions, had a policy of including provisions for Secretarial approval; but that policy was not mandated by Congress.

Nor do we agree that Congress intended to recognize as legitimate only those tribal taxes authorized by constitutions

written under the IRA.[2]   Long before the IRA was enacted, the Senate Judiciary Committee acknowledged the validity of a tax imposed by the Chickasaw Nation on non-Indians.   See S. Rep. No. 698, 45th Cong., 3d Sess., 1–2 (1879).   And in 1934, the Solicitor of the Department of the Interior published a formal opinion stating that a tribe possesses "the power of taxation [which] may be exercised over members of the tribe and over nonmembers."   *Powers of Indian Tribes*, 55 I. D. 14, 46.   The 73d Congress, in passing the IRA to advance tribal self-government, see *Williams* v. *Lee*, 358 U. S. 217, 220 (1959), did nothing to limit the established, pre-existing power of the Navajos to levy taxes.

Some tribes that adopted constitutions in the early years of the IRA may be dependent on the Government in a way that the Navajos are not.   However, such tribes are free, with the backing of the Interior Department, to amend their constitutions to remove the requirement of Secretarial approval. See, *e. g.*, Revised Constitution and Bylaws of the Mississippi Band of Choctaw Indians, Art. 8, § 1(r) (1975).

Petitioner also argues that the Indian Mineral Leasing Act of 1938, 52 Stat. 347, 25 U. S. C. § 396a *et seq.*, requires Secretarial approval of Navajo tax laws.   Sections 1 through 3 of the 1938 Act establish procedures for leasing oil and gas interests on tribal lands.   And § 4 provides that "[a]ll operations under any oil, gas, or other mineral lease issued pursuant to the [Act] shall be subject to the rules and regulations promulgated by the Secretary of the Interior." 25 U. S. C. § 396d.   Under this grant of authority, the Secretary has issued comprehensive regulations governing the operation of oil and gas leases.   See 25 CFR pt. 211 (1984).   The Secretary, however, does not demand that

---

[2] For example, in *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134, 152–154 (1980), we sustained taxes imposed on nonmembers by the Colville and Lummi Tribes even though the Tribes were not organized under the IRA.

tribal laws taxing mineral production be submitted for his approval.

Petitioner contends that the Secretary's decision not to review such tax laws is inconsistent with the statute. In *Merrion*, we emphasized the difference between a tribe's "role as commercial partner," and its "role as sovereign." 455 U. S., at 145–146. The tribe acts as a commercial partner when it agrees to sell the right to the use of its land for mineral production, but the tribe acts as a sovereign when it imposes a tax on economic activities within its jurisdiction. *Id.*, at 146; cf. *White* v. *Massachusetts Council of Construction Employers, Inc.*, 460 U. S. 204, 206–208 (1983). Plainly Congress, in passing § 4 of the 1938 Act, could make this same distinction.

Even assuming that the Secretary could review tribal laws taxing mineral production, it does not follow that he must do so. We are not inclined to impose upon the Secretary a duty that he has determined is not needed to satisfy the 1938 Act's basic purpose—to maximize tribal revenues from reservation lands. See S. Rep. No. 985, 75th Cong., 1st Sess., 2–3 (1937). Thus, in light of our obligation to "tread lightly in the absence of clear indications of legislative intent," *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 60 (1978), we will not interpret a grant of authority to regulate leasing operations as a command to the Secretary to review every tribal tax relating to mineral production.[3]

Finally, we do not believe that statutes requiring Secretarial supervision in other contexts, see, *e. g.*, 25 U. S. C. §§ 81, 311–321, reveal that Congress has limited the Navajo Tribal Council's authority to tax non-Indians. As we noted in *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324 (1983), the Federal Government is "firmly committed to the

---

[3] Section 2 of the 1938 Act provides a limited exemption for tribes organized under the IRA. 25 U. S. C. § 396b. Because we conclude that the 1938 Act does not require the Secretary to review tribal taxes, however, the Navajo Tribe's decision not to accept the IRA is irrelevant.

goal of promoting tribal self-government." *Id.*, at 334–335; see, *e. g.*, Indian Financing Act of 1974, 88 Stat. 77, 25 U. S. C. § 1451 *et seq.* The power to tax members and non-Indians alike is surely an essential attribute of such self-government; the Navajos can gain independence from the Federal Government only by financing their own police force, schools, and social programs. See President's Statement on Indian Policy, 19 Weekly Comp. Pres. Doc. 98, 99 (Jan. 24, 1983).

## III

The Navajo Government has been called "probably the most elaborate" among tribes. H. R. Rep. No. 78, 91st Cong., 1st Sess., 8 (1969). The legitimacy of the Navajo Tribal Council, the freely elected governing body of the Navajos, is beyond question.[4] See, *e. g.*, 25 U. S. C. §§ 635(b), 637, 638. We agree with the Court of Appeals that neither Congress nor the Navajos have found it necessary to subject the Tribal Council's tax laws to review by the Secretary of the Interior; accordingly, the judgment is

*Affirmed.*

JUSTICE POWELL took no part in the consideration or decision of this case.

---

[4] The Tribal Council has 88 members who are elected every four years. There are approximately 79,000 registered tribal voters, and 69% of these persons voted in the last tribal election in 1982.