# Supreme Court of the Navajo Nation

**Navajo Communications Company, Inc., Appellant,**
v.
**Navajo Tax Commission, Appellee.**
**Decided March 5, 1991**

## OPINION

Before TSO, Chief Justice, AUSTIN and *CADMAN (*sitting by designation), Associate Justices.

Frank J. Lally, Esq., Gallup, New Mexico and Richard G. Campbell Jr., Esq., Reno, Nevada, for the Appellant; and Marcelino R. Gomez, Esq., Navajo Nation Department of Justice, Window Rock, Navajo Nation (Arizona), for the Appellee.

Opinion delivered by Austin, Associate Justice.

This appeal is from a June 16, 1989 decision of the Navajo Tax Commission which ruled that the appellant, Navajo Communications Company, Inc., is not exempt from the Navajo Business Activity Tax. The overall question is whether the Navajo Nation has granted Navajo Communications a tax waiver. To answer that question, we decide the following issues: (1) whether the United States Government, acting through the Bureau of Indian Affairs, has limited the Navajo Nation's power to tax; (2) whether the Navajo Nation, by joining in the Contract of Sale between the Bureau of Indian Affairs and Navajo Communications, expressly waived its right to impose its Business Activity Tax on Navajo Communications: and (3) whether taxing Navajo Communications was beyond the intent of the Navajo Tribal Council when it enacted the Business Activity Tax. We affirm the decision of the Navajo Tax Commission.

## I. FACTS

Navajo Communications is a New Mexico corporation providing telephone services within the Navajo Nation to residents and businesses, including the Navajo Nation Government. Navajo Communications operates under the concurrent regulatory authority of the Navajo Telecommunications Regulatory Commission and the utility regulatory commissions of the states of Arizona, New Mexico, and Utah.

The Navajo Tax Commission was established on January 16, 1974, by Navajo Tribal Council Resolution No. CJA-6-74, to administer Navajo tax laws and to

promulgate tax rules and regulations.

On April 30, 1970, Navajo Communications entered into a contract to purchase the existing telephone system on the Navajo Nation from the Bureau of Indian Affairs (BIA). The telephone system was initially established and operated by the BIA for governmental purposes. By the late 1960's, business and residential use had so rapidly increased that the BIA believed it was no longer financially feasible for the federal government to maintain and improve the system. In consideration for the sale and transfer, Navajo Communications agreed to pay the BIA cash, stock and debentures. The system was sold to Navajo Communications because the BIA believed that private enterprise would be better able to operate the telephone system. Because the system operates within the Navajo Nation and requires Navajo Communications' use of certain facilities and rights-of-way on tribal land, Navajo Tribal Council consent to grants of rights-of-way was necessary. 25 C.F.R. § 169.3(a) (1990).

The Contract of Sale was signed by the BIA and Navajo Communications on April 30, 1970, and accepted on the same date by Chairman Raymond Nakai on behalf of the Navajo Tribe. The issues in this case center on the following provisions of that contract:

Section (2) provides:

> SELLER agrees to convey, transfer and assign to PURCHASER all of the said telephone system, rights and properties used and useful by it in the operation of the system, free and clear of all encumbrances; and the Navajo Tribe agrees that the purchase price for the system includes the right to do business on the Reservation and all rights of way in the system already granted and to be granted in the future and further agrees that by virtue of the benefits to be derived by the Tribe from the operation of the system by PURCHASER, that no charges shall be made to PURCHASER for the right to do business or operate the system on Navajo Lands....
>
> . . . .

Section (13) provides:

> Notwithstanding that this Contract for Sale and Purchase of the Navajo Telephone System is between BIA as SELLER, and NAVAJO COMMUNICATIONS CO., INC., as PURCHASER, it is expressly recognized that the purchase price includes compensation for the right to do business on the Reservation and for rights-of-way. Accordingly, BIA does agree that all the consideration to be paid by PURCHASER under this Contract shall be held by BIA until a final determination is made as to the fair and proper allocation of the proceeds of this sale between BIA and the Navajo Tribe. Such determination shall be made by mutual agreement of BIA and the Navajo Tribe within 180 days after execution of this contract, and if no agreement is reached within such time the determination shall be made by the Secretary of the Interior.

Navajo Communications argues that these provisions grant it a contractual waiver from taxation.

The Navajo Nation exercises its power to tax in a number of ways. Title 24 of the Navajo Tribal Code establishes the Navajo Possessory Interest Tax, the Oil and Gas Severance Tax, and the Business Activity Tax. The Business Activity Tax (24 N.T.C. §§ 401 through 445), was enacted by Navajo Tribal Council Resolution No. CAP-36-78 on April 28, 1978. The Navajo Tax Commission began assessing the tax on July 1, 1978. Neither the Business Activity Tax nor the Navajo Tax Commission existed when Navajo Communications purchased the telephone system from the BIA in 1970.

The Business Activity Tax is imposed on the source gains of a branch. 24 N.T.C. § 402. A branch is "any person [including corporations], engaged in trade, commerce, manufacture, power production, or any other productive activity ... within the Navajo Nation." 24 N.T.C. § 404(1). Source gains include the gross receipts of a branch from the sale of Navajo services. 24 N.T.C. § 404(2). Navajo services are all services performed within the Navajo Nation. 24 N.T.C. § 404(4). The Navajo Tax Commission determined that Navajo Communications was providing services as defined in 24 N.T.C. § 404(4) and was therefore subject to the Business Activity Tax.

Exemptions and exclusions from the tax are set forth in 24 N.T.C. § 408. Specific exemptions are granted to the Navajo Nation Government; any wholly-owned subdivision or enterprise of the Navajo Nation Government; the federal government, if the tax is prohibited by federal law; and the salaries or wages of individual employees. Other exemptions are listed in section 408. Navajo Communications does not claim an exemption from taxation under section 408.

On February 24, 1987, Navajo Communications requested a refund of all Business Activity Taxes it had paid prior to that time. The claim for refund was denied by the Executive Director of the Navajo Tax Commission on April 29, 1987, and Navajo Communications proceeded to formal conference — a preliminary step in the administrative process. At formal conference, the conferee denied Navajo Communications' claim. On May 13, 1987, Navajo Communications appealed the conferee's decision to a hearing officer of the Navajo Tax Commission.

The hearing officer ruled against Navajo Communications. Navajo Communications then appealed to the Navajo Tax Commission and that body affirmed the hearing officer's decision on June 16, 1989, by holding that Navajo Communications is not exempt from the tax. Navajo Communications appealed to this Court from the decision of the Navajo Tax Commission.

## II. FEDERAL DIVESTITURE AND LIMITATION

The Navajo Nation has the inherent sovereign power to tax both members and non-members engaged in economic activities within its territorial borders. The

Navajo Nation's taxing power is a necessary instrument of self-government and territorial management. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 139 (1982). This power to tax is not one granted to the Navajo Nation by the federal government. Rather, it is a fundamental attribute of tribal sovereignty which the Indian tribes retain unless divested of it by Congress or by necessary implication as a result of their dependent status. *Washington v. Confederated Tribes*, 447 U.S. 134, 152 (1980).

The United States Supreme Court has summarized the Indian tribes' taxing powers as follows:

> The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management. This power enables a tribal government to raise revenues for its essential services. The power [to tax] ... derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction, and to defray the costs of providing governmental services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction. (citation omitted).

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. at 137.

The United States Supreme Court has specifically held that the Navajo Nation has the inherent power to impose its Business Activity Tax on non-members and without first obtaining approval from the Secretary of the Interior. *Kerr-McGee Corp. v. Navajo Tribe*, 471 U.S. 195 (1985). The Court spoke of Navajo taxing power in this manner: "The power to tax members and non-Indians alike is surely an essential attribute of such self-government; the Navajos can gain independence from the Federal Government only by financing their own police force, schools and social programs." (citation omitted). *Id.* at 201.

Congress can divest the Navajo Nation of its inherent taxing power. *Washington v. Confederated Tribes*, 447 U.S. at 152. Navajo Communications has not argued, nor have we found, a federal law that has expressly effected such a divestiture. Navajo Communications also did not argue that the Navajo Nation's power to tax has been divested by necessary implication as a result of its dependent status. Consequently, we do not go into that analysis.

Navajo Communications instead argues that the federal government, acting through the BIA, limited the Navajo Nation's power to tax it, when the Commissioner of Indian Affairs signed the Contract of Sale and the contract was "approved through governmental channels."[1] Navajo Communications specifically relies on the following language, found in Section (2) of the Contract of Sale, to argue that the federal government has effected a limitation: "[N]o charges shall be made to PURCHASER for the right to do business or operate

---

1. Navajo Communications' exact argument is as follows: "[T]he Federal Government, by and through the Bureau of Indians Affairs, has taken positive action to eliminate imposition of future taxes on NCC. This was a contract signed by the head of the B.I.A. and approved through governmental channels, which eliminates future charges for NCC to do business or operate the system on the Nation." Brief for Appellant at 10-11.

the system on Navajo lands."

Navajo Communications' position is apparently premised upon the principle that Congress, using its plenary power over Indian affairs, may limit a tribe's exercise of its sovereign power. *United States v. Wheeler*, 435 U.S. 315 (1978); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. at 141, 147. We are not persuaded that Navajo Communications has proven such a limitation in this case.

First, Navajo Communciations did not present evidence that Congress authorized the BIA to limit the Navajo Nation's power to tax Navajo Communications in the Contract of Sale. Until Congress acts, "the tribes retain their existing sovereign powers." *United States v. Wheeler*, 435 U.S. at 323. Without congressional authorization, any unilateral act by the BIA would be of no effect. *Taylor v. Bradley*, 6 Nav. R. 147, 153-154 (1989).

Second, the language in Section (2) of the Contract of Sale, relied upon by Navajo Communications, does not speak to taxation at all. The "right to do business" language speaks to the Navajo Nation's proprietary role of granting franchises to do business on Navajo land and privileges to use Navajo land. The Navajo Nation acts as a commercial partner when it sells the right to the use of its land for business purposes, but acts as a sovereign when it taxes. *Kerr-McGee Corp. v. Navajo Tribe*, 471 U.S. at 198; *Merrion v. Jicarilla Apache Tribe*, 455 U.S. at 145-146.

Third, the United States Supreme Court in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. at 152, said that there must be "clear indications" that a tribe's taxing power has been taken away. Even assuming *arquendo* that the BIA was given authority to limit tribal taxing power, we find no "clear indications" in the contract that that was what the BIA intended.

Finally, the federal government is committed to tribal self-government and economic self-sufficiency. We doubt that the federal government would circumvent these policies, by contract or otherwise, and limit the Navajo Nation's power to tax without expressly saying so and without the Navajo Nation's full understanding of the consequences of the limitation. *See, Merrion v. Jicarilla Apache Tribe*, 455 U.S. at 148.

We hold that the federal government has not imposed a limitation on the Navajo Nation's sovereign power to tax Navajo Communications.

## III. COUNCIL WAIVER BY CONTRACT

In *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, the United States Supreme Court discussed the legal principles that must be used to determine whether an Indian tribe has by contract waived its power to tax. The Court concluded that the principles used to determine whether the federal government, or a state or local government, has waived a sovereign power apply also to alleged waivers of tribal sovereign powers. *Id.* at 148. The court said, regardless of its source, "sovereign power, even when unexercised, is an enduring presence that governs all

contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." Speaking directly to the taxing power, the Court said, "Even where the contract at issue requires payment of a royalty for a license or franchise, the government's power to tax remains unless it 'has been specifically surrendered in terms which admit of no other reasonable interpretation.'" *Id.* We incorporate these principles into Navajo Nation law.

We turn now to Navajo Communications' argument that the Navajo Nation has granted it a waiver from the Business Activity Tax in the Contract of Sale. Navajo Communications asserts that the following terms of Sections (2) and (13) in the Contract of Sale grant it a "clear and unequivocal exemption" from the Business Activity Tax:

Section (2):

> [T]he Navajo Tribe agrees that the purchase price for the system includes the right to do business on the Reservation and all rights of way in the system already granted and to be granted in the future and further agrees that by virtue of the benefits to be derived by the Tribe from the operation of the system by PURCHASER that no charges shall be made to PURCHASER for the right to do business or operate the system on Navajo lands.

> ....

Section (13):

> [I]t is expressly recognized that the purchase price includes compensation for the right to do business on the Reservation and for rights-of-way.

A claim of contractual waiver from the Navajo Nation's taxing power cannot be sustained unless the language of the contract in question contains a precise, clear and unmistakable surrender of the Nation's taxing power. This strict standard is necessary because the taxing power is extremely important to the Navajo Nation. It is essential to the Nation's self-government, territorial management, and is vital to its very survival.

The language granting the alleged waiver from the Navajo Nation's taxing power must be expressed on the face of the contract. Surely, an issue as important as a waiver from taxation, if truly raised in the bargaining process, will be clearly spelled out in the language of the contract. We cannot rewrite the contract. We can only read the words of the contract and give the words their plain and ordinary meaning. Using this approach, we conclude that Navajo Communications has not been granted a contractual waiver from the Business Activity Tax. The reasonable interpretation of this contract is that the BIA sold the telephone system to Navajo Communications, and the Navajo Nation, as landowner, granted to Navajo Communications only two rights: the right to do business on the Navajo Nation; and rights-of-way necessary to operate the business. The language supporting this interpretation is repeated three times in the very sections relied upon by Navajo Communications:

Section (2):

> [T]he Navajo Tribe agrees that the purchase price for the system includes *the right to do business on the Reservation* and *all rights of way* in the system already granted and to be granted in the future.... (emphasis added).

> [N]o charges shall be made to PURCHASER for *the right to do business* or *operate the system on Navajo lands.* (emphasis added).

> ....

Section (13) :

> [I]t is expressly recognized that the purchase price includes compensation for *the right to do business* on the Reservation and for *rights-of-way.* (emphasis added).

Thus, instead of granting Navajo Communications a tax waiver, the Nation, in return for the purchase price, granted Navajo Communications only the right to do business on the Navajo Nation and rights-of-way necessary to operate the business. Grants of these rights are expressed precisely and clearly in the Contract of Sale.

We have searched the language in the entire contract and have not found words expressly granting Navajo Communications a tax waiver or an exemption. In fact, the words taxes, waiver, and exemption are completely absent from the language of the contract. Thus, the language of the contract, taken as a whole, including those parts of Sections (2) and (13) relied upon by Navajo Communications, leads to only one legitimate interpretation: The Navajo Nation granted Navajo Communications a franchise (the right to do business) and the corresponding rights-of-way necessary to operate the franchise on Navajo lands.

Navajo Communications argues that the words "no charges" means no taxes and thus are words expressing a clear and unequivocal exemption from future taxation by the Navajo Nation. The imposition of a tax may sometimes be called a "charge." Black's Law Dictionary 211 (5th ed. 1979). But, for a waiver of the Nation's sovereign taxing power to be found, the word "charge[s]" must unmistakably include taxes. Absent such clarity, an implied waiver would result, and this Court will not find a tax waiver by implication. Here, the word "charges" clearly does not include taxes. We easily construe it to mean payment of franchise fees.

Navajo Communications next contends that it paid "well in excess of the estimated value of the telephone system as it existed in 1970" and thus the price must have included both franchise fees and taxes. Navajo Communications adds that, "This exemption from taxes was a clear inducement for NCC to enter into this contract...." Brief for Appellant at 10. This argument fails for several reasons. First, the Business Activity Tax is calculated as a percentage of Navajo Communications' gross receipts. The purchase price, however, was a fixed amount. It is unlikely that the Navajo Nation would accept a fixed fee as a substitute for a percentage of profits tax for the indefinite future. Second, the

Business Activity Tax was not enacted until 1978. It is improbable that the Business Activity Tax was a subject of negotiation and thus an "inducement" in 1970. Third, franchise and royalty fees and other conditions of entry are demanded by the Navajo Nation in its capacity as a business' commercial partner. However, in selling to the business the rights to operate and use Navajo lands, the Navajo Nation does not relinquish its right to tax. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. at 144. Finally, if the waiver from taxation was an important part of its decision to purchase the telephone system and was deemed essential to the profitable operation of the business, then Navajo Communications would have made certain that the waiver was expressly stated in the contract.

Navajo Communications also argues that when it purchased the right to do business on the Navajo Nation, that purchase included the right to do such business free from the Business Activity Tax. Navajo Communications apparently believes that it purchased a tax exemption. This might be a plausible argument if the only right granted by the purchase contract was the right to be free from the Business Activity Tax. There were, however, two other rights separate from the right to be free from the tax granted to Navajo Communications in the purchase contract. These are the right to do business on the Navajo Nation at all and the rights-of-way necessary to operate the telephone system. The contract can reasonably be interpreted as granting only these rights to Navajo Communications for the purchase price.

Finally, Navajo Communications argues that 24 N.T.C. § 420 supports its position that the Business Activity Tax is a charge for doing business. This section provides that a "Branch" which fails to comply with the requirements of the Business Activity Tax may have its rights to engage in business within the Navajo Nation suspended. This argument confuses the remedy for failure to pay the tax with the question of whether something is a tax. Section 420 gives the Navajo Nation a remedy to enforce the Business Activity Tax by suspending the right to do business. The statute does not turn the Business Activity Tax into a charge for doing business.

This Court will hereafter not begin to examine an alleged tax waiver unless the party shows that either the alleged waiver or the self-imposed limitation against taxation has been clearly and precisely expressed through a proper legislative enactment of the Navajo Nation Council, the governing body of the Navajo Nation. We will not accept an implied waiver, and we will not accept a waiver in express terms unless it is contained in an enactment of the Navajo Nation Council which shows clear intent to waive the Navajo Nation's sovereign taxing power.

## IV. COUNCIL INTENT

The last issue is whether taxing Navajo Communications was beyond the intent of the Navajo Tribal Council when it enacted the Business Activity Tax. We conclude that the Council plainly intended that the Business Activity Tax be imposed on Navajo Communications.

The statutory language in 24 N.T.C. § 402, as defined in section 404, plainly includes the taxing of Navajo Communications. The statute requires the imposition of the Business Activity Tax on the source-gains (gross receipts from the sale of Navajo goods or services, minus certain deductions) of branches. Branches are "any person engaged in trade, commerce, manufacture, power production, or any other productive activity ... within the Navajo Nation." 24 N.T.C. § 404(1). Navajo Communications is included in this broad umbrella of targets of the Business Activity Tax, because it is engaged in commerce within the Navajo Nation. The plain meaning of the Business Activity Tax statute must be upheld.

The decision of the Navajo Tax Commission is affirmed.