**Ferrell SECAKUKU, Chairman of the Hopi Tribal Council of the Hopi Tribe, Intervenor,**

v.

**The NAVAJO NATION, Defendant.**

**Civil No. 88–0931–PCT–BMV.**

United States District Court,
D. Arizona.

May 9, 1997.

James E. Scarboro, Denver, CO, for Plaintiff.

Eric Dahlstrom, Phoenix, AZ, for Defendant.

## MEMORANDUM and ORDER

VAN SICKLE, Senior District Judge.

### I. Introduction

In January, 1996, the Ninth Circuit ruled that the Navajo Nation's Possessory Interest Tax (PIT) and Business Activity Tax (BAT) levied on Peabody Coal Company's mining operations in the former Joint Use Area (JUA) in northern Arizona were proceeds directly related to the coal jointly owned by the Navajo Nation and the Hopi Tribe, and subject to the mandate to "share and share alike" imposed by the Navajo–Hopi Land Settlement Act of 1974, as amended 25 U.S.C. § 640d–6.[1] *Peabody Coal Company v. Navajo Nation,* 75 F.3d 457, 469 (9th Cir.1996). The PIT and BAT are proceeds whether collected, waived or abated. *Id.* This Court must determine what economic value, if any, the Hopi have proved the Navajo received in each of these categories, and evaluate the Navajo's affirmative defenses of laches, waiver, estoppel, including estoppel by acceptance of the benefits.

This Court ruled (Docket # 359) that it would resolve these remaining issues on the existing record, and both Parties presented argument and briefs at Phoenix, Arizona in November, 1996. The Hopi Tribe strenuously objected in their proposals for further proceedings on remand, to any new evidence being introduced, preferring to rest on the existing record. Hopi Tribe's Reply Regarding Further Proceedings, September 4, 1996 at 2–3. In addition, the Hopi tribe represented to this Court on the record on June 5, 1996 that the only need for new evidence that it anticipated was to update the figures for collected taxes and unique governmental expenses. Transcript of Telephone Conference, June 5, 1996 at 5, lines 10–23; *see also* Hearing Transcript, Hopi Closing Argument, November 7, 1996, at 8, line 2–10, line 20.

### II. Background

Although the historical background and timeline of the Navajo–Hopi land dispute[2] has been recounted many times by various courts, administrative bodies and the United States Congress, the events are complex, and since an understanding of the basic chronology is important to the resolution of the matter now before this court, a recapitulation of the events is necessary.[3] In 1868, a Reserva-

---

1. The relevant portion of the text of the statute is: Partition of the surface of the lands of the joint use area shall not affect the joint ownership status of other minerals within or underlying such lands shall be managed jointly by the two tribes, subject to supervision and approval by the Secretary as otherwise required by law, and the proceeds therefrom shall be divided between the tribes share and share alike.

2. The land dispute between the Navajo and the Hopi has arisen as a direct result of paternalistic and misguided actions taken by the United States government, and is a shameful chapter in our history. This Court is deeply sympathetic to the wounds inflicted on each tribe as a result of this history.

   For a thorough and sensitive account of the land dispute see, Bendek, Emily, *The Wind Won't Know Me: A History of the Navajo–Hopi Land Dispute,* Vintage Books, New York, 1993. For a compelling analysis of one aspect of how the tribes have been manipulated and their trust betrayed see, 1996 B.Y.U. L.Rev. 449, Charles F. Wilkinson, *Home Dance, The Hopi, and Black Mesa Coal: Conquest and Endurance in the American Southwest.* For a contemporary critique of Congress' actions surrounding the partition see, Richard Shifter and W. Richard West, Jr., *Healing v. Jones: Mandate for Another Trail of Tears?,* 51 N.D. L.Rev. 72 (1974).

3.

| | |
|---|---|
| 1868 | Original Navajo Reservation established by Treaty |
| 1882 | President Arthur establishes Hopi Reservation |
| Early 20th Century | Navajo move into 1882 Hopi Reservation with Dept. Of Interior Permission |
| 1934 | Congress revises the boundaries of the Navajo reservation with The Navajo Boundary Act of 1934, 48 Stat. 960 |
| 1958 | Congress permits suit to quiet title to 1882 Hopi Reservation |
| 1962 | *Healing v. Jones* holds that area of 1882 Reservation where Hopi mesas are located (District 6) granted exclusively to Hopi, area outside of District 6 belongs to both tribes (JUA). |
| 1964 and 1966 | Original coal leases |
| 1968 | Navajo Tribal Resolution regarding water |
| 1969 | NGS Lease (Exhibit # 306) |
| 1974 | Settlement Act passed by Congress, authorizing partition of surface and subsur- |

tion for the Navajo Nation was created by treaty with the United States Government. Treaty With The Navajo, 1868, 15 Stat. 667, 1868 WL 5268 (Trty.). The boundaries of this Reservation were described as follows:

> bounded on the north by the 37th degree of north latitude, south by an east and west line passing through the site of old Fort Defiance, in Canon Bonito, east by the parallel of longitude which, if prolonged south, would pass through old Fort Lyon, or the Ojo-de-oso, Bear Spring, and west by a parallel of longitude about 109 degrees 30' west of Greenwich, provided it embraces the outlet of the Canon-de-chilly, which canon is to be all included in this reservation shall be, and the same is hereby, set apart for the use and occupation of the Navajo Tribe of Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States to admit among them. *Id.*

In 1882, President Chester A. Arthur created a Reservation for the Hopi by executive order. Moqui (Hopi) Reserve 1882 WL 10834 (Exec.Ord.). Its boundaries were described as follows:

> "the tract of country in the Territory of Arizona lying and being within the following-described boundaries, viz, beginning on the one hundred and tenth degree of longitude west from Greenwich, at a point 36 degrees and 30 minutes north, thence due west to the one hundred and eleventh degree of longitude west, thence due south to a point 35 degrees and 30 minutes north, thence due east to the one hundred and tenth degree of longitude, and thence due north to place of beginning . . ." *Id.*

In the early part of the 20th Century the Navajo were permitted to move onto the 1882 Hopi Reservation with the permission of the Department of the Interior. In 1934, Congress changed the boundaries of the Navajo Reservation, creating what is known as the "1934 Reservation." Navajo Boundary Act of 1934, June 14, 1934 c. 521, 48 Stat. 960. In 1958 Congress authorized suit to quiet title to the 1882 reservation. In 1963, the Supreme Court upheld a decision by the Arizona District Court which held that the area of the 1882 Reservation referred to as District 6, where the Hopi mesas are located, belongs exclusively to the Hopi, and that the land outside of District 6 belonged to both sides as a Joint Use Area (JUA). *Jones v. Healing*, 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). In 1964, the Navajo entered into a lease with the Sentry Royalty Company to mine coal from the area held exclusively by the Navajo (Navajo North lease). That lease had a reopener on the royalty rate provision, which provided for a readjustment of the royalty on the twentieth anniversary of that lease's effective date, which was February, 1964. Exhibit # 303. In 1966, Sentry entered into separate leases with the Navajo and the Hopi to mine coal from the jointly owned JUA (hereinafter JUA or South leases). Exhibits # 304 and # 305. Neither of the original JUA leases had reopener provisions. In 1968, the Navajo Tribal Council passed a resolution agreeing not to assert rights over the Colorado River water to be used for the soon to be built Navajo Generating Station (hereinafter NGS). Exhibit # 398. In 1969, the Navajo entered into the lease for the NGS. Neither Sentry, nor its successor Peabody was a party to the NGS lease. One of the items given up by the Navajo in the NGS lease was the

| | |
|---|---|
| | face, while requiring that minerals be held in joint ownership and proceeds from minerals divided share and share alike. |
| 1978 | Navajo impose tax code |
| 1979 | Partition takes legal effect |
| 1978–1985 | No Navajo taxes collected; no bills sent |
| 1984 | Re-Opener on (Navajo North only) Lease |
| 1985 | U.S. Supreme Court upholds Navajo taxing power |
| 1986 | Peabody begins paying taxes (beginning with 1985 tax year) |
| 1987 | Re-negotiated leases finalized and Secretary approves leases on recommendation of both Tribes |
| 1988 | Peabody brings suit claiming PIT and BAT are invalid, and Hopi intervene |

right to tax coal coming out of the Kayenta mine. The Navajo did not have a tax program at the time the lease was signed. Exhibit # 306.

In 1974, Congress passed the Navajo–Hopi Land Settlement Act. The surface of the JUA, as authorized by Congress, was partitioned by the District Court. *Sekaquaptewa v. MacDonald,* D.C. No. Civ. 579 PCT (D.AZ. 1977) *aff'd,* 626 F.2d 113 (9th Cir.1980). The mineral estate was treated as a separate issue by the Settlement Act and left in joint ownership.

In 1978, the Navajo Nation enacted, for the first time, a tax program which included the PIT and BAT at issue here. Peabody has paid at least a portion of those taxes on the Black Mesa mine for the years 1986 to the present, as part of the package of 1987 lease amendments. Trial Transcript, Testimony of Derrick Watchman, March 18, 1994, at 17–18. Also, tax claims prior to the date that Peabody began paying taxes, were abated. Peabody brought this law suit in 1988 challenging the validity of the taxes, and the Hopi intervened. The Hopi's primary argument, until the 9th Circuit's January 1996 ruling, was that the taxes were invalid because the Hopi were not merely joint owners of the subsurface, but also co-sovereigns.

## III. *Findings of Fact and Legal Analysis*

### A. *Overview*

Although the Ninth Circuit's definition of proceeds, "all economic benefit derived from the coal," could seem to call into question all the various contractual relationships connected to the enormous coal reserves under the former joint use area, this case is about taxes, and has always been about taxes. Hearing Transcript, November 5, 1996, at 5, lines 11–18. There has been, and continues to be, a great deal of litigation about various issues affecting these lands. However, what must be settled now, pursuant to the mandate of the Ninth Circuit,[4] is what amount of economic value the Navajo have received as a result of their taxation program,[5] and when the total package of proceeds which each tribe has received is examined, whether the total amount of proceeds the Navajo have received is in excess of the total proceeds the Hopi have received.[6]

The difficulty with determining the value of waived or abated Navajo taxes, is that like the coal itself, the taxes have no inherent value, but acquired value as a result of the transactions related to the coal mining and mined coal. And, any value they had, was not static but linked to other events, and to the often unexpressed perceptions of the parties over time. Most significantly, the legal status of the taxes was never fully settled, and therefore their face value was meaningless during the period from when the Navajo tax program was passed in 1978 until the signing of the 1987 lease amendments with the Navajo.

■ It is well established that a contract may be supported by an unequal exchange of

---

**4.** On Remand the Hopi shall have the burden of persuasion to prove the amount of value which the Navajo have received from the PIT and BAT whether collected, waived or abated. The Navajo shall have the burden of persuasion to prove the extent to which they are entitled to an "offset" due to unique governmental expenses resulting from the location of the mining on Navajo land. We decline to reach the Navajo's affirmative defenses or the Hopi's argument regarding prejudgment interest. These issues are properly reserved for the district court. 75 F.3d 457, 469.

**5.** The 9th Circuit did not define "value received," however, the Hopi acknowledge that this is the meaning of value in this case. "[T]he following matters are yet to be decided: A. the amount of PIT and BAT taxes actually collected by the Navajo Nation through 1993 from the Black Mesa Mine located in the Former Joint Use Area (JUA); B. the value, if any, received by the Navajo

Nation for abating or waiving imposition of the PIT or BAT at the Black Mesa and Kayenta Mines on the FJUA...." The Hopi Tribe's Supplemental Memorandum in Support of Judgment, November 1, 1996, at 2; *see also* Trial Transcript, Hopi Argument, March 15, 1994 at 87. The Ninth Circuit's definition of proceeds also supports this interpretation. We hold that the plain meaning of "proceeds" is "all economic benefit derived from the coal." 75 F.3d 457, 469 (1996).

**6.** This court sought to establish this concept of overall equality by its ruling (Docket # 365) on November 5, 1996 that it would interpret the term "offset" broadly. It is here reiterating and attempting to clarify that holding. It is axiomatic, given the Circuit's mandate, that each tribe is only entitled to share in some item which the other tribe alone receives if that individual item creates an overall imbalance between the tribes.

consideration, or even by worthless consideration given by one of the parties. *See* Restatement Second of Contracts §§ 71, 79. The fact that an item is valuable to the parties does not mean that it has a value which may be expressed as a dollar amount, and the exchange may very well be for another intangible. Further, the parties to a large and complicated transaction or set of transactions, such as those here (which concern the building and operation of two mines and two power plants) may decide that certainty has strong value as an item of consideration in the interlocking agreements necessary for such projects to move forward. It is clear from the record that this has been the case throughout all the transactions associated with these coal reserves. As a result, the task at hand is akin to pulling one thread from a cloth without breaking the thread, or destroying the cloth. The value, if any, of the waived and abated taxes must be determined by, at a minimum,[7] looking back into seven leases, between different parties, covering different lands, different facilities, entered into over a period of nearly twenty years, and discerning where possible, the intentions and understandings of the various parties to those leases. To look back into these agreements, which were negotiated and entered into (without any notion that items that they incorporated would have to be equally "shared") and to make factual findings regarding Navajo waived and abated taxes, is a nearly impossible task.

*B. Substantial Equality of the Lease Amendments before Considering Taxes*

At re-argument in November, 1996, the Navajo substantially focused their defense to convince this Court that the overall amounts of proceeds received by each tribe were only equal with the taxes included because, according to the Navajo, the Hopi receive substantially more than the Navajo in other areas such as water payments, surface rental, and scholarships. Hearing Transcript, November 6, 1996, at 8–62. The Hopi vigorously contested, and argued that the Secretary of the Interior found the leases to be "substantially equivalent"[8] in 1987 without considering the taxes. Without giving undue weight to the Secretary's findings, and after having considered all the evidence and the arguments made by both sides concerning that evidence, this Court finds that the 1987 lease amendments provided substantially equal proceeds or benefits to both the Navajo and the Hopi before the issue of Navajo proceeds from the PIT and BAT taxes is considered.[9]

*C. Taxes Waived*

1. 1978–1985

The most significant Hopi claim was for waived taxes on the Kayenta mine beginning with the passage of the Navajo tax code in 1978. The Hopi Tribe's Post-Trial Memorandum at 26 (June 30, 1994). In 1969, the Navajo entered into an agreement with, the Arizona Public Service Company, the Department of Water and Power of City of Los Angeles, the Nevada Power Company, the Salt River Project Agricultural Improvement and Power District, and the Tucson Gas and Electric Company, which led to the Navajo Generating Station being built at Page, Arizona. One of the items of consideration given by the Navajo was the agreement not to impose a variety of taxes,[10] all of which did

---

7. Some other items of consideration are embodied in entirely different documents. For example, the electricity [rate] is in a contract between the Navajo and the Arizona Public Service Company. Testimony of Leroy Michael, March 17, 1994, at 61, lines 12–15.

8. The Secretary's exact language in approving the lease amendments was: "that the lease amendments are substantially equivalent in what each Tribe will receive under its respective lease, taking into account the overall transaction." Exhibit # 322.

9. The Navajo are now foreclosed from making any further new arguments concerning the overall equality of the lease arrangements. This includes the introducing of any new items of "unique governmental cost" not itemized in Exhibit # 617.

10. The relevant portion of the NGS lease reads as follows:
7 (e) Except as provided in Section 7(f) hereof, the lease rentals and payments for rights-of-way for this Lease are to be in lieu of all taxes, assessments, levies, imposts, exactions or charges of any kind made or imposed by the Tribe, and the Tribe covenants that it will not tax

not exist at that time, and some of which have never been instituted to this day. Trial Transcript, Testimony of Leroy Michael, March 17, 1994, at 33 (stating that in entering into the tax provisions of the NGS lease the Navajo Nation was not being asked to defer or give up any current taxes it might have imposed). Other items given by the Navajo included a promise not to assert rights over the Colorado River water necessary for the project and the granting of necessary easements and rights-of-way. Also within this bundle was the Navajo agreement not to tax coal coming to the Station. Thus, when the Navajo passed their comprehensive tax program nine years later, the PIT and BAT tax claims on the coal coming out of the Kayenta mine were never enforced, based on an agreement not to tax which had been made nine years earlier. The Navajo did not "waive" the taxes in 1969, because in 1969 there was nothing to waive. When the Navajo tax program was passed in 1978, the Navajo were already under an obligation not to tax coal coming out of the Kayenta mine and so the enactment of the tax program did not constitute a waiver any more than did the original NGS lease. Not one penny of PIT or BAT tax on the Kayenta mine coal has ever been collected. Trial

Transcript, Testimony of Derrick Watchman, March 18, 1994, at 24. The Hopi argue that what the Navajo received in exchange for this agreement not to tax was the location of the NGS on Navajo land and the Navajo employment preference embodied in the lease. And the Hopi originally alleged that the value for these items is in the tens of millions of dollars. However, at the time the waiver was made, the taxes obviously had no fixed value because they did not exist, no value was established by the NGS lease, and the lease did not recite what the Navajo would receive in exchange for the agreement not to tax. The Hopi now concede that, based on the record, it is not possible to affix a value to these items, and they have made no effort to do so.[11] The Navajo further contend that, as with the abated Black Mesa Mine taxes, the agreement as to taxes was fundamental to any agreement, or even to negotiations taking place. In other words, the tax waiver was "one of several essential considerations that moved from the Navajo to the Navajo Generating Station plant owners in exchange for a whole group of considerations that moved in the direction of the Navajo Nation." Testimony of Leroy Michael, March 17, 1994, at 35. Where, as

or assess, in any manner whatever, directly or indirectly, any rights, property or activity associated with the generation of electricity at Navajo Generating Station, and its transmission to the electric systems of lessees, including, but not limited to the Leased Lands, the Rights-of-Way, the § 323 Grant, this Lease, the Related Rights, the leasehold interests of the Lessees in the Lease, or the property of the Lessees located on the Leased Lands or located on Reservation Lands pursuant to the Related Rights, or the transmission or communications facilities referred to in Section 5 hereof, or Lessee's activities under the Lease, or their ownership, construction, operation or removal of the Navajo Generation [sic] Station by Lessees, pursuant to the Lease, or the power generated thereon or the transmission sale, or disposal of such power, their income, or otherwise, or the sale or delivery of fuel or the Fuel Transporter, or the severance or extraction of fuel by such suppliers (other than royalties provided in their leases from the Tribe), or the Coal lease as it relates to the Dedicated Area, the leasehold interests of the suppliers of fuel in the Coal Lease as it relates to the Dedicated Area, the property of the suppliers of fuel located on the Leased Lands and on Peabody Leased Lands to the extent used to

supply fuel to Lessees, or the railroad right-of-way referred to in Section 5(b) hereof, or any improvements or property located thereon, or any railroad and related facilities and equipment used in the transportation of fuel, or the transportation of fuel, [sic] or the diversion or use of water, provided, however, that after thirty-five (35) years from the commencement of commercial operation of Unit 3 of the Navajo Generating Station, the foregoing covenants shall lapse as to taxation of the property of Lessees located on the Leased Lands, or on the Reservation Lands pursuant to the Related Rights, or located pursuant to the rights-of-way and easements referred to in Section 5(a) and 5(b) hereof; provided that during the remainder of the Lease, no property taxes shall be levied by the Tribe on such property at a rate or in an amount in excess of one-half (½) of the equivalent rate, in relation to value, of the aggregate property taxes levied or imposed by the State of Arizona or any political subdivision thereof, as the case may be, applicable to such property at that time. Exhibit # 306.

11. "I cannot attach a particular value to this particular waiver of taxes. I can't do it, and I will concede right off that I can't." Hearing Transcript, Argument of James E. Scarboro, Esq., November 7, 1996, at 107, lines 11–13.

here, the Hopi have not put forth evidence which would explain which item of consideration was given in exchange for what, this court is not willing to find that the Navajo received the entire bundle in exchange for their tax waiver, when that is clearly not what happened. This Court is unconvinced by the Hopi evidence and argument on this point and therefore finds that the Hopi have not proven that the Navajo received an ascertainable value for the tax waiver contained in the lease.

### 2. 1985–present

As with many other items in these agreements, it appears that Peabody merely received certainty and a promise made directly to it with regard to not having to pay taxes on the Kayenta coal. The only value which could be assigned to the so-called waived taxes would derive from the 1987 Navajo reaffirmation of the waiver in the amendments to the Navajo leases with Peabody.[12] That re-affirmation was the first time the Navajo made a promise to waive Kayenta Mine taxes directly to Peabody. However, this Court finds there is no dollar value or specific item of consideration which the Hopi have proved the Navajo received in exchange for that promise. Further, there is no proof that the Navajo gave any value other than certainty, which has no specific economic value, to Peabody by re-affirming a waiver which presumably was already legally enforceable, and which the Navajo had given no indication that they intended to disavow. Although the promise had not been made directly to Peabody in the past, certainly the NGS participants to whom it had been made, as Peabody's primary customers had substantially the same interest in the continuation and enforcement of the waiver so that the "certainty," if any, Peabody received as a result of the re-affirmation was at best superfluous.

The Hopi argue, as with the abated taxes that the Navajo must have received at least as much value as they gave. In other words, that whatever was received must have been roughly equal to the "face value" of the taxes. This is not however, axiomatic. As noted, the taxes never had a face value until after their validity was upheld by the Supreme Court, and after the Navajo Tax Commission began issuing assessments and bills in 1985. See, The Navajo Nation's Statement of Facts, # 37. The Hopi direct the Court to testimony by various witnesses, including Judge Michael Nelson, and Leroy Michael (Trial Transcript, March 17, 1994, at 63–64) who state the 1987 amendments were "fair." The fact that negotiators for any of the parties felt that the overall agreements were fair does not mean that the value the Navajo received, if any, for re-affirming their pledge to not tax coal going into the NGS station was equal to the statutory face value set of the PIT and BAT had they been collected on the Kayenta mine operation. The value of consideration is ultimately determined by the subjective intent of the parties. Where that intent is not manifest in the texts of the controlling documents, as is the case in both the 1969 NGS Lease and in the 1987 Amendments, and where there is not conclusive testimony, this court will not infer or create a value. There simply is not sufficient evidence to make such a finding. The Hopi argue that the employment preference and the electric rate were in exchange for the waiver. However, the Hopi also freely admit that those items are not subject to an objective valuation. Hopi Closing Argument Transcript, November 5, 1996 at 56, 80 and 87. Because there is no value which is readily apparent from the face of these transactions, and because the Hopi have made no effort to put forth a reasonable formula for assigning value, this Court finds that the Hopi have not carried their burden of proof on the issue of the value of waived taxes and holds that as a result, the Hopi are not entitled to recover any amount from the Navajo for past waived taxes. This Court does note however, that this does not relieve the Navajo from the burden of sharing any value received as a result of any future waiver of taxes with the Hopi.

---

**12.** The Navajo lead negotiator for the final phase of the 1987 lease amendments testified essentially that this was his understanding. Trial Transcript, Testimony of Michael Stolbach, March 17, 1994, at 139.

### D. *Abated Taxes*

The Navajo tax program was enacted in 1978, and the validity of those taxes was challenged and was ultimately upheld by the Supreme Court in 1985. *Kerr–McGee Corporation v. Navajo Tribe of Indians*, 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985). In the intervening period, the Navajo Tax Commission was not funded, and no assessments or bills were sent to any taxpayers, including Peabody Coal Company. Trial Transcript, Testimony of Judge Michael Nelson, May 2, 1994 at 29. Thus, even after the Supreme Court had upheld the Navajo power to levy the taxes without Secretarial approval, the legally enforceable fight of the Navajo to actually collect the "full amount of" back taxes was in serious question.

The Navajo argue that the abatement of back taxes on the Black Mesa mine was an absolute condition of Peabody's coming to the table to re-negotiate the South Leases which did not have re-opener provisions. Exhibit # 568; Trial Transcript, Testimony of Michael Stolbach, March 17, 1994, at 166; Hearing Transcript, November 6, 1996, at 80. And thus, both tribes have already received the same benefit as a result of the abatement—re-negotiation of the South/JUA leases.

▮ Judge Michael Nelson, who was the Counsel to the Navajo Tribal Chairman for much of the lease re-negotiations testified that part of the consideration for the Navajo forgivance of back taxes on the Black Mesa Mine, was the moving back of the date for increased royalties from August 1984 to February 1984 on the Navajo North lease, which according to Nelson was worth at least $8.5 million. Nelson however, was not a participant in the final stages of the negotiations or in the lease signing because he left office when Peterson Zah, the Tribal Chairman for whom he worked left in January of 1987. The final lease amendments were not signed by new Chairman MacDonald until November, 1987. The final written documents do not reflect the specificity of consideration to which Nelson testified, and there is evidence in the record that the agreement in principle about which Nelson testified was substantially modified after he and Chairman Zah were no longer involved in the negotiations. Exhibit # 481. In addition, as early as 1984, Peabody conceded that the re-opener date was February. Exhibit # 65, at 5. There is not sufficient support in the record to establish the Hopi position that the value of the abatement was at least $8.5 million. Former Peabody President Kenneth R. Moore did also testify that there was some dispute as to the effective date for increased royalties on the Navajo North lease. Trial Transcript, Testimony of Kenneth R. Moore, June 16, 1994, at 115, lines 11–25. However, Mr. Moore who, unlike Mr. Nelson was involved in all the negotiations from beginning to end testified that there was no specific consideration discussed in exchange for the Navajo abating the 1978–1984 taxes. Trial Transcript, March 17, 1994 at 95, lines 4–9 and at 121–123. The Hopi also submit tax assessments issued by the Navajo Tax Commission to Peabody after the signing of the 1987 amendments which give dollar amounts for the abated taxes. These documents are not relevant because they were issued after the events in question and provide no insight into what the exchange, if any, was for the abatement. Further, there is not any evidence to link these documents to the intention of the parties at the time the leases were entered into.[13] These values, set by the Tax Com-

---

13. This assessment includes the testimony of Mr. Derrick Watchman, who testified at trial on March 18, 1994. Mr. Watchman's testimony did not connect the subsequent paper value of the abated taxes established by the Tax Commission to any exchange embodied in the leases, or to the intent of the parties when they entered into the lease. Watchman admitted that he had no knowledge of what value the Navajo received for the abatement. Trial Transcript, Testimony of Derrick Watchman, March 18, 1994, at 47. Watchman also asserted without documentation that the value of the waived taxes on the Kayenta Mine amounted to $40 million a year. Even if taken as true, this again reflects a paper value, and not the value of the waived taxes based on what the Navajo received for the waiver. Finally, Watchman's testimony is of almost no value, and should be given very little weight, because he did not testify that he had even the slightest knowledge of the negotiations or lease contents, and he did not testify that he was at the Tax Commission in any decision-making capacity prior to 1988, and thus had no direct knowledge of the relevant time period.

mission after the lease signings, cannot vest the taxes with retroactive legal enforceability, without which they would still have been valueless. This Court will not string together scattered bits of evidence in order to substantiate a finding that the Navajo must now pay the Hopi $4.25 million dollars for the abated taxes, especially without additional evidence which is contemporaneous with the final negotiations and the actual signing of the leases. For the reasons stated, this Court finds that there is insufficient evidence to support a specific finding of value received by the Navajo as a result of abating taxes. It therefore holds that the Hopi are not entitled to collect any amount of money for this item.

### E. Collected Taxes and Offsets for Unique Governmental Expenses

The amount of money the Navajo have collected in taxes is not in serious dispute, nor are the categories of unique governmental expenses resulting from the location of the mining operation on Navajo lands or the amounts of those expenses. Both parties rely on the testimony and calculations of Hopi expert John Gunnett for the amount of taxes collected through 1993, and on Navajo expert Mark Berkman for the amount and categories of unique governmental expenses. There was a difference in the actual figures presented by the parties for collected taxes at the hearing in November, 1996. However, since the Navajo did not contest the Hopi's original calculations, but rather contested the significance of the numbers, this Court will accept the figures presented by the Hopi Tribe in their November, 1996 brief and argument. Therefore, this Court finds that the total amount of taxes collected between 1978 and 1993, for both the PIT and the BAT was $8,174,417. The Hopi share is one-half this amount, or $4,087,208.50. The deduction for unique governmental expenses caused by the location of the mining on the land, will be in the categories and amounts described in Demonstrative Exhibit # 617, and not contested by the Hopi Tribe. However, the cost figures will be segregated based on production figures for the Navajo North and JUA areas as suggested by the Hopi in November, 1996. Hearing Transcript, Argument of James E. Scarboro, Esq., November 7, 1996, at 109–110. The production figures will be provided by Peabody Coal Company. If necessary, either party will have the opportunity to request additional documentation and/or to respond to these calculations. After the response, if any, if for any reason either side would like to make further argument to the court concerning the validity or accuracy of those figures such a request will be duly considered, and if granted, a hearing at a location to be determined, or a telephone conference will be set to hear such argument. A preliminary telephone conference will be scheduled by the Court immediately after the entry of this order.

### F. Prejudgment Interest

The Hopi tribe has requested prejudgment interest in this matter, and argues that the holding in *Hopi Tribe v. Navajo Tribe,* 46 F.3d 908 (9th Cir.1995) is controlling in this case and mandates the award of prejudgment interest. The Hopi misinterpret the holding of *Hopi Tribe v. Navajo Tribe;* the 9th Circuit did not mandate the award of prejudgment interest under the Settlement Act, but rather held that Congress had allowed for it. The general principles of determining whether prejudgment interest should be awarded in cases arising under federal law therefore apply, and the matter is within the sound discretion of this Court. *Home Savings Bank v. Gillam,* 952 F.2d 1152,1161 (9th Cir.1991). The Navajo Nation has resisted, awarding prejudgment interest to the Hopi. It argues that such an award would work a grave injustice and would essentially mean giving the Hopi a windfall for its delay in bringing suit. Among other bases for the Navajo argument is the fact that the Hopi tribe demands interest on taxes which the Hopi claimed were violative of their sovereignty, and thus void, until after the January, 1996, Ninth Circuit decision. The Navajo are correct in asserting the principal that "in deciding how much prejudgment interest should be granted a district court must examine ... matters encompassed within the merits of the underlying action." *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 176, 109 S.Ct. 987, 991, 103

L.Ed.2d 146 (1989). Having balanced the equities this Court finds that the award of prejudgment interest would make the Hopi whole, as is the purpose of such an award. At the time the Navajo began collecting and Peabody began paying the PIT and BAT taxes on the Black Mesa Mine, the Hopi were entitled to receive one-half of those proceeds. The argument that the Hopi unduly delayed in bringing suit does not apply convincingly to the collected taxes, as suit was brought shortly after the signing of the 1987 lease amendments. The method of calculating interest is also at the discretion of the trial court, but "this discretion must be exercised with a view to the fact that prejudgment interest is an element of compensation, not a penalty." *Western Pacific Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1288–89 (9th Cir.1984). Having weighed the equities, this Court determines that interest will be calculated as described in the Settlement Act, 25 U.S.C. § 640d–17(a)(1), 6 per centum per annum compounded annually, running from the first date on which Peabody actually paid any taxes, through December 31, 1996.

### G. *Navajo Affirmative Defenses*

The Navajo Affirmative Defenses are not without merit as they relate to the question of the waived and abated taxes. This Court notes the evidence of Hopi knowledge of, and silence concerning, a possible claim for a share in the taxes at the time the leases were signed and approved by the Secretary. The Hopi's urging of the Navajo to go ahead and settle the tax issue during the negotiations; and the Hopi advocacy in favor of Secretarial approval of all the lease amendments, also weigh strongly in favor of the Navajo affirmative defenses. However, because the Hopi have not met their burden as regards the waived and abated taxes, the Navajo affirmative defenses need not be reached. And further, since any merit that the affirmative defenses do have relates to the waived and abated taxes, this Court finds that they do not provide a sufficient basis for negating the Hopi's right to a share in the collected taxes.

IV. Based on the foregoing, IT IS ORDERED:

1. The intervening Plaintiff, the Hopi tribe, is entitled to $4,087,208.50, which is one half of the amount of PIT and BAT taxes collected by the Navajo tribe between 1978–1993, and to prejudgment interest as described in Section III–F of this Memorandum and Order in the amount of six percent per annum, compounded annually on the same. The total dollar amount of prejudgment interest will be determined subsequent to the completion of the steps outlined in Part III–E of this order.

2. The Navajo Nation is ordered to provide, within thirty days of the date of the filing of this order, supplemental calculations and documentation for collected taxes and unique governmental expenses for the period from 1993 to December 31, 1996. The Hopi Tribe shall be given the opportunity to respond to these calculations, if necessary.

3. The Hopi Tribe has not met its burden of persuasion to prove the value of the waived and abated Navajo Nation PIT and BAT taxes on the jointly owned coal, and thus is not entitled to any amount in those categories.

4. This court declines to rule on the Navajo affirmative defenses, because a ruling is not necessary for final resolution of this matter.

5. The Navajo Nation is ordered, from the date of this order forward, to pay to the Hopi Tribe one-half of any PIT and BAT taxes paid and collected by the Navajo Nation in conjunction with the jointly owned coal within thirty days of such payment. Any such payment which is not timely made by the Navajo Nation to the Hopi Tribe shall henceforth be subject to interest at a rate of six percent per annum to be compounded monthly.